**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

In the Matter of:
BELLINGHAM INSURANCE
AGENCY, INC.,
                    *Debtor*,

EXECUTIVE BENEFITS
INSURANCE AGENCY,
                    *Appellant*,

v.

PETER H. ARKISON, TRUSTEE,
solely in his capacity as
Chapter 7 Trustee of the
estate of Bellingham
Insurance Agency, Inc.,
                    *Appellee*.

No. 11-35162

D.C. No.
2:10-cv-00929-MJP

OPINION

Appeal from the United States District Court
for the Western District of Washington
Marsha J. Pechman, Chief District Judge, Presiding

Argued and Submitted
October 13, 2011–Seattle, Washington

Filed December 4, 2012

Before: Alex Kozinski, Chief Judge, Richard A. Paez,
Circuit Judge, and Raner C. Collins,[*] District Judge.

Opinion by Judge Paez

---

[*] The Honorable Raner C. Collins, United States District Judge for the District of Arizona, sitting by designation.

# SUMMARY[**]

## Bankruptcy

Affirming the district court's affirmance of the bankruptcy court's summary judgment, the panel held that a non-Article III bankruptcy judge lacks constitutional authority to enter a final judgment in a fraudulent conveyance action against a nonclaimant to the bankruptcy estate, but that the nonclaimant here waived its right to an Article III hearing.

The panel held that following *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33 (1989), and *Stern v. Marshall*, 131 S. Ct. 2594 (2011), the public rights exception to the rule of Article III adjudication does not encompass federal-law fraudulent conveyance claims, even though Congress designated such claims as core bankruptcy proceedings. The panel stated that in light of *Stern*, *In re Mankin*, 823 F.3d 1296 (9th Cir. 1987), was overruled. The panel held that 11 U.S.C. § 157(b)(1) provides bankruptcy courts the power to hear fraudulent conveyance cases and to submit reports and recommendations to the district courts.

The panel also held that the right to a hearing in an Article III court is waivable, and that here the nonclaimant consented to the bankruptcy judge's adjudication of the fraudulent conveyance claim by failing to object until the case reached the court of appeals.

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

The panel held that the bankruptcy trustee satisfied all elements of a constructively fraudulent transfer of the debtor's property under 11 U.S.C. § 548 and under Washington State law. In addition, the nonclaimant was a successor corporation of the debtor and therefore liable for its debts.

## COUNSEL

Nicholas Arthur Paleveda; Law Offices of Nicholas Paleveda MBA J.D. LL.M, Bellingham, Washington, for Appellant.

Denice Moewes; Wood & Jones, Seattle, Washington, for Appellee.

Alan Vanderhoff; Vanderhoff Law Group, San Diego, California, for Amicus Curiae Alan Vanderhoff.

G. Eric Brunstad, Jr.; Dechert LLP, Hartford, Connecticut, for Amicus Curiae G. Eric Brunstad, Jr.

Seth P. Waxman and Craig Goldblatt; Wilmer Cutler Pickering Hale and Dorr LLP, Washington, D.C., for Amici Curiae S. Todd Brown, G. Marcus Cole, Ronald D. Rotunda, and Todd J. Zywicki.

John Anthony Edwards Pottow; University of Michigan Law School, Ann Arbor, Michigan, for Amicus Curiae John Anthony Edwards Pottow.

Roberta Ann Colton; Trenam Kemker Attorneys, Tampa, Florida, for Amicus Curiae the Business Law Section of the Florida Bar.

Paul D. Moore; Duane Morris LLP, Boston, Massachusetts, for Amici Curiae New CH YMC Acquisition LLC, Yellowstone Mountain Club, LLC, and Yellowstone Development, LLC.

Lynne F. Riley; Riley Law Group LLC, Boston, Massachusetts; and Jessica D. Gabel; Georgia State University College of Law, Atlanta, Georgia, for Amicus Curiae National Association of Bankruptcy Trustees.

Nathaniel Garrett; Jones Day, San Francisco, California, for Amicus Curiae Jones Day.

Sarang Vijay Damle and Robert Loeb; U.S. Department of Justice Civil Division, Washington, D.C., for Amicus Curiae United States of America.

Douglas Hallward-Driemeier; Ropes & Gray, LLP, Washington, D.C., for Amicus Curiae Marcia M. Tingley.

Christopher Conant; Conant Law LLC, Denver, Colorado, for Amicus Curiae Timothy L. Blixseth.

David Anthony Gaston; Law Offices of David Anthony Gaston, San Diego, California; and Edward Silverman; Sandler Lasry Laube Byer & Valdez, LLP, San Diego, California, for Amici Curiae Alejandro Diaz-Barba and Martha Margarita Barba de la Torre.

Matthew Rutledge Schultz and Christopher Daniel Sullivan; Trepel Greenfield Sullivan & Draa LLP, San Francisco, California, for Amicus Curiae Concerned Chapter 7 and 11 Trustees and Plan Administrators.

**OPINION**

PAEZ, Circuit Judge:

This quotidian bankruptcy case presents a novel question: can a non-Article III bankruptcy judge enter a final judgment in a fraudulent conveyance action against a nonclaimant to the bankruptcy estate? Federal law empowers bankruptcy judges to do so, but we hold that the Constitution forbids it.

The Executive Benefits Insurance Agency suffered an adverse final judgment in a fraudulent conveyance at the hands of a bankruptcy judge. But our decision today is no reprieve, because we also hold that the company consented to the adjudication of the fraudulent conveyance claim by a bankruptcy judge by failing to object until the case reached this court. Thus, unencumbered by constitutional doubts, we review the entry of summary judgment de novo, and affirm.

**I**

Nicholas Paleveda and his wife, Marjorie Ewing, operated a welter of companies, including Aegis Retirement Income Services, Inc. ("ARIS") and the Bellingham Insurance Agency, Inc. ("BIA"). ARIS designed and administered defined-benefit pension plans, and BIA sold insurance and annuity products that funded those plans.

BIA and ARIS were closely related: Paleveda owned 100% of ARIS and served as the CEO and sole director of BIA until February 14, 2006, when Ewing took over. Ewing owned 80% of BIA and served as ARIS's general manager. ARIS and BIA shared an office and a phone number. Because ARIS lacked sufficient assets to operate independently, it

routed all of its income and expenses through BIA, kept joint accounting records with BIA, and declared its income on consolidated tax returns with BIA.

By early 2006, BIA was insolvent. And though the company ceased operations on January 31, 2006, it did not stop acting entirely. Two weeks after closing its doors, the company irrevocably assigned the insurance commissions from one of its largest clients, the American National Insurance Company, to Peter Pearce, a longtime BIA and ARIS employee who had often acted as a conduit for insurance commissions between BIA and its clients.

The day after BIA stopped operating, Paleveda used BIA funds to incorporate the Executive Benefits Insurance Agency, Inc. ("EBIA"). In 2006, $373,291.28 of commission income earned between January 1 and June 1 was deposited into an account held jointly by ARIS and EBIA. Pearce deposited $123,133.58 and EBIA deposited the remainder. At the end of the year, all of the deposits were credited to EBIA via an "intercompany transfer."[1]

In the meantime, BIA had filed a voluntary Chapter 7 bankruptcy petition in the United States Bankruptcy Court for the Western District of Washington. The Trustee, Peter Arkison—the Appellee in this case—filed a complaint against EBIA and ARIS in the same court to recover the commissions deposited into the EBIA/ARIS account, which the Trustee alleged to be property of the estate. The complaint alleged eighteen causes of action, including federal- and state-law preferential and fraudulent transfer claims and a claim that

---

[1] As the district court did, we draw these facts from the uncontroverted accounting evidence produced by the Trustee.

EBIA was a successor corporation of BIA and therefore liable for its debts.

The bankruptcy court granted summary judgment in favor of the Trustee, concluding that the deposits into the EBIA/ARIS account were fraudulent conveyances of BIA assets and that EBIA was a "mere successor" of BIA. The bankruptcy court entered a final judgment for $373,291.28.[2]

EBIA appealed to federal district court. The district court affirmed, holding that the commissions paid into the ARIS/EBIA account were fraudulent transfers under both the Bankruptcy Code, 11 U.S.C. § 548, and Washington's Uniform Fraudulent Transfer Act, Wash. Rev. Code § 19.40.041. The district court also affirmed the bankruptcy court's judgment that EBIA was liable for BIA's debts as a corporate successor.

---

[2] In total, EBIA was credited with $373,291.28 in commission income for the January 1, 2006 to June 1, 2006 period, an amount that formed the basis of the bankruptcy court's judgment. Of this total, $123,133.58 was deposited by Pearce, and the remaining $250,836.98 was deposited by EBIA itself.

In his declaration, the Trustee's accounting expert, Michael Quackenbush, appears to have improperly summed these figures. He avers, "There are five deposits buy [*sic*] Pearce totaling $122,454.30. There are 14 additional deposits into the ARIS account by EBIA for commissions it earned totaling $277,885.82. Thus the total commissions deposited into the ARIS account for commissions earned from BIA related business was $373,291.28." In fact, the sum of $122,454.30 and $277,885.82 is $400,340.12, according to Microsoft's venerable Windows Calculator. Some expert. The accountant also summed the deposits within each category incorrectly: the Pearce deposits actually total $123,133.58, and the EBIA deposits total $250,157.70. Because the corrected figures sum to $373,291.28, however, the expert's errors did not undermine the accuracy of the bankruptcy court's judgment.

EBIA appealed. In a motion to dismiss submitted prior to oral argument, EBIA objected for the first time to the bankruptcy judge's entry of final judgment on the Trustee's fraudulent conveyance claims. Styled as a motion to vacate the judgment for lack of subject-matter jurisdiction, and relying on *Stern v. Marshall*, 131 S. Ct. 2594 (2011), the motion argued that the bankruptcy judge was constitutionally proscribed from entering final judgment on the Trustee's claims.[3] It is to this vexing constitutional issue that we first turn.

## II

### A

Bankruptcy judges are appointed for terms of 14 years, 28 U.S.C. § 152(a)(1), and their salaries are subject to Congressional diminution. *Id.* § 153(a). Hence, bankruptcy judges cannot exercise "[t]he judicial Power of the United States," which is vested by the Constitution in courts whose judges enjoy life tenure and salary protection. U.S. Const. art. III, § 1.

Nonetheless, bankruptcy judges enjoy substantial statutory authority. Although the district courts have exclusive jurisdiction over "all cases under title 11," *id.*

---

[3] Following oral argument in this appeal, we invited briefs from amicus curiae on the questions: 1) whether bankruptcy courts may enter a final, binding judgment on an action to avoid a fraudulent conveyance, and 2) whether, if they cannot enter such final judgments, bankruptcy courts may hear the proceeding and submit a report and recommendation to a federal district court. *See Exec. Benefits Ins. Agency v. Arkison (In re Bellingham Ins. Agency, Inc.)*, 661 F.3d 476 (9th Cir. 2011). We appreciate the many thoughtful briefs that were submitted in response to our invitation.

§ 1334(a), they may refer all of the cases within that broad jurisdiction to bankruptcy judges, *id.* § 157(a). What the bankruptcy court may do with a given referred proceeding depends on whether the proceeding is denominated a "core" or a "non-core" proceeding. In all "core proceedings arising under title 11, or arising in a case under title 11," a bankruptcy judge has the power to "hear and determine the controversy" and enter final orders, subject only to appellate review. *Id.* § 157(b)(1). In a non-core proceeding "that is otherwise related to a case under title 11," however, a bankruptcy judge may only "submit proposed findings of fact and conclusions of law to the district court." *Id.* § 157(c)(1). The entry of final judgment in non-core proceedings is the sole province of Article III judges.

Section 157(b)(2) enumerates sixteen nonexclusive examples of "core proceedings." Among these are "proceedings to determine, avoid, or recover fraudulent conveyances." *Id.* § 157(b)(2)(H). The bankruptcy judge hearing the Trustee's claim was thus empowered by statute to enter a final judgment. Indeed, until quite recently, the exercise of that statutory power was routine and uncontroversial. *See, e.g.*, *Jones v. Schlosberg*, No. 04-00571, 2005 WL 6764810, at *5–6 (C.D. Cal. 2005) (affirming a bankruptcy court's entry of judgment in a fraudulent conveyance action); *see also Duck v. Munn (In re Mankin)*, 823 F.2d 1296, 1300–01 (9th Cir. 1987) (holding that both state- and federal-law fraudulent conveyance actions are core proceedings). But following the Supreme Court's decision in *Stern v. Marshall*, the view that such judgments are consistent with the Constitution is no longer tenable.

## B

To explain why this is so, we must begin somewhat earlier, with the Supreme Court's epochal decision in *Northern Pipeline Construction Co. v. Marathon Pipe Line Co.*, 458 U.S. 50 (1982). The Bankruptcy Reform Act of 1978 invented the modern bankruptcy judge, subject to the same conditions as today: a 14-year term and a mutable salary. *Id.* at 53. *Northern Pipeline* was the Supreme Court's first effort to demarcate the constitutional limits of these judges' authority.

Northern Pipeline filed a Chapter 11 petition for reorganization in a bankruptcy court. *Id.* at 56. It then filed a suit against Marathon Pipe Line for a prepetition breach of contract and warranty. *Id.* Marathon sought to dismiss the suit on the grounds that the claim at issue could only be decided by an Article III judge. *Id.*

A plurality of the Court agreed that the assignment of Northern Pipeline's state-law claims for resolution by a bankruptcy judge violated Art. III of the Constitution. *Id.* at 87 (Brennan, J., plurality opinion); *id.* at 91 (Rehnquist, J., concurring in judgment). The plurality admitted to only three exceptions to the rule of Article III adjudication: territorial courts, *id.* at 64, military tribunals, *id.* at 66, and cases involving "public" as opposed to "private" rights, *id.* at 67.[4]

---

[4] A majority of the *Northern Pipeline* Court also acknowledged that it is constitutionally permissible for an Article III court to assign factfinding responsibility to an adjunct, provided that the Article III court retains "the essential attributes of the judicial power." 458 U.S. at 77 (quoting *Crowell v. Benson*, 285 U.S. 22, 51 (1932) (internal quotation marks omitted)). Nonetheless, "the bankruptcy court is not an 'adjunct' of either the district court or the court of appeals." *Id.* at 91 (Rehnquist, J., concurring in the

Outside of the narrowly drawn exceptions for territorial and military courts, the distinction between public and private rights was the crucial determinant of whether a dispute belonged in an Article III court: "Our precedents clearly establish," the Court explained, "that *only* controversies in the former category may be removed from Art. III courts and delegated to legislative courts or administrative agencies for their determination. Private-rights disputes, on the other hand, lie at the core of the historically recognized judicial power." *Id.* at 70 (internal citations and footnote omitted).

While a majority of the Court could not agree on the scope of the public rights exception, a majority did agree that the public rights exception could not justify the adjudication of Northern Pipeline's claims by a non-Article III officer. *See id.* at 69 (plurality opinion); *id.* at 91 ("To whatever extent different powers granted under [the Bankruptcy Reform] Act might be sustained under the 'public rights' doctrine . . . I am satisfied that the adjudication of Northern's lawsuit cannot be so sustained.") (Rehnquist, J., concurring).

Despite consigning the breach of contract and breach of warranty claims at issue to the category of private rights, the *Northern Pipeline* plurality hinted that some quantum of bankruptcy proceedings might fall within the public rights exception:

> [T]he restructuring of debtor-creditor relations, which is at the core of the federal bankruptcy power, must

---

judgment); *see also id.* at 81–86 (plurality opinion). *Stern* reaffirmed that bankruptcy courts are not adjuncts. *See* 131 S. Ct. at 2611 ("Nor can the bankruptcy courts under the 1984 Act be dismissed as mere adjuncts of Article III courts . . . .").

be distinguished from the adjudication of state-created private rights, such as the right to recover contract damages that is at issue in this case. The former may well be a "public right," but the latter obviously is not.

*Id.* at 71.

Following the *Northern Pipeline* decision, Congress amended the statutes governing bankruptcy jurisdiction and bankruptcy judges. *See* Bankruptcy Amendments and Federal Judgeship Act of 1984, Pub. L. No. 98-353, 98 Stat. 333 (the "1984 Act"). The legislation enacted, among other reforms, the division of claims in bankruptcy cases into core and non-core proceedings. This distinction was clearly inspired by the *Northern Pipeline* plurality's dictum that certain proceedings "at the core of the federal bankruptcy power . . . may well be a 'public right.'" 458 U.S. at 71; *see also In re Mankin*, 823 F.2d at 1305.

The cases following *Northern Pipeline* created substantial new ambiguity about the content and import of the public rights exception. In *Thomas*, the Court addressed a law that required pesticide manufacturers to submit research data to the Environmental Protection Agency on a new product's "health, safety, and environmental effects." 473 U.S. at 571. The law allowed subsequent registrants of similar products to rely on the proprietary data, but required them to compensate the first manufacturer for the data and to submit to binding arbitration of any disagreement over the fee amount. *Id.* at 573–74. The *Northern Pipeline* plurality had defined public rights as "matters arising between the Government and persons subject to its authority in connection with the performance of the constitutional functions of the executive

or legislative departments." 458 U.S. at 67–68 (plurality opinion) (internal quotation marks omitted). The *Thomas* Court rejected that definition, opting for a more fluid position: "the public rights doctrine reflects simply a pragmatic understanding that when Congress selects a quasi-judicial method of resolving matters that 'could be conclusively determined by the Executive and Legislative Branches,' the danger of encroaching on the judicial powers is reduced." 473 U.S. at 589 (quoting *Northern Pipeline*, 458 U.S. at 68). Under this newly pragmatic approach, the Court was convinced that "the right created by [the statute] is not a purely 'private' right." *Id.* Rather, it bore "many of the characteristics of a 'public' right": it "serve[d] a public purpose as an integral part of a program safeguarding the public health" and "represent[ed] a pragmatic solution to the difficult problem of spreading the costs of generating adequate information regarding the safety, health, and environmental impact of a potentially dangerous product." *Id.* at 589–90.

Similarly, in *Commodity Futures Trading Commission v. Schor*, 478 U.S. 833, 851 (1986), the Supreme Court abjured "formalistic and unbending rules" for "determining the extent to which a given congressional decision to authorize the adjudication of Article III business in a non-Article III tribunal impermissibly threatens the institutional integrity of the Judicial Branch." Instead, the Court held that determining when a proceeding required an Article III court entailed balancing several factors "with an eye to the practical effect that the congressional action will have on the constitutionally assigned role of the federal judiciary":

Among the factors upon which we have focused are the extent to which the "essential attributes of judicial

power" are reserved to Article III courts, and, conversely, the extent to which the non-Article III forum exercises the range of jurisdiction and powers normally vested only in Article III courts, the origins and importance of the right to be adjudicated, and the concerns that drove Congress to depart from the requirements of Article III.

*Id.* (citing *Thomas*, 473 U.S. at 587, 589–93). This multi-factor standard demanded a certain hierophancy on the part of the lower courts, which had to comb through the Court's inconsistent statements about the metes and bounds of Article III to apply it. But the standard did reflect a pragmatic accommodation of the realities of modern bankruptcy practice and the logistical and administrative difficulty of circumscribing the authority of the bankruptcy courts.

Encouraged by the Supreme Court's retreat from a formalist conception of the public rights exception and the limitations of Article III more generally, we concluded in 1987 that certain controversies at the core of the bankruptcy process implicated public rights. *See In re Mankin*, 823 F.2d at 1308 ("The public rights doctrine in large part simply constitutionalizes the historical understanding of what need and need not be committed to Article III officers for determination. While, as indicated above, it has always been understood that the property rights of creditors cannot be committed exclusively to the political branches for determination, by the same token it has always been understood that bankruptcy proceedings need not be solely determined by Article III officers."). We also held that the portion of bankruptcy-related proceedings that fit within the public rights exception was coextensive with that portion which had been designated as "core" by the 1984 Act. *Id.*

Today, we acknowledge *Mankin*'s demise.[5] It has been felled by two cases: *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33 (1989), and *Stern v. Marshall*, which together point ineluctably to the conclusion that fraudulent conveyance claims, because they do not fall within the public rights exception, cannot be adjudicated by non-Article III judges.

In *Granfinanciera*, the Court considered whether a non-claimant to a bankruptcy estate has a Seventh Amendment right to a jury trial when sued by the bankruptcy trustee under 11 U.S.C. § 548 to recover allegedly fraudulent prepetition conveyances. 492 U.S. at 36. Because Congress had designated fraudulent conveyance actions core proceedings, which non-Article III judges could decide, the Court defined the issue as "whether the Seventh Amendment confers on petitioners a right to a jury trial in the face of Congress' decision to allow a non-Article III tribunal to adjudicate the claims against them." *Id.* at 50. And that required the Court to again construe the public rights exception, because "Congress may only deny trials by jury in actions at law . . . in cases where 'public rights' are litigated." *Id.* at 51.

Was a fraudulent conveyance proceeding a matter of public right? The Court's answer was, if not unequivocal, at least conclusive: "Although the issue admits of some debate, a bankruptcy trustee's right to recover a fraudulent conveyance under 11 U.S.C. § 548(a)(2) seems to us more accurately characterized as a private rather than a public right as we have used those terms in our Article III decisions." *Id.*

---

[5] Because the result in *Mankin* cannot be reconciled with the reasoning in *Stern*, we may overrule it without taking this case en banc. *See Miller v. Gammie*, 335 F.3d 889, 899 (9th Cir. 2003).

at 55. The Court echoed the *Northern Pipeline* plurality's distinction between the (possibly[6]) public-right "restructuring of debtor-creditor relations"—the "core of the federal bankruptcy power"—and the "adjudication of state-created private rights." *Northern Pipeline*, 458 U.S. at 71. Fraudulent conveyance actions, the *Granfinanciera* Court explained, are obviously in the latter category, because they "are quintessentially suits at common law that more nearly resemble state-law contract claims brought by a bankrupt corporation to augment the bankruptcy estate than they do creditors' hierarchically ordered claims to a pro rata share of the bankruptcy res." 492 U.S. at 56.

*Granfinanciera* clarified that fraudulent conveyance actions are not matters of public right, and that a noncreditor retains a Seventh Amendment right to a jury trial on a bankruptcy trustee's fraudulent conveyance claim. Some courts, however, seemed disinclined to deduce from those holdings that such litigants also retain a right to be heard by an Article III court. *See, e.g.*, *McFarland v. Leyh (In re Tex.*

---

[6] Notably, the *Granfinanciera* Court did not decide the question whether even the "restructuring of debtor-creditor relations" was in fact a "public right." 492 U.S. at 56 n.11 ("We do not suggest that the restructuring of debtor-creditor relations is in fact a public right. This thesis has met with substantial scholarly criticism, and we need not and do not seek to defend it here. Our point is that even if one accepts this thesis, the Seventh Amendment entitles petitioners to a jury trial." (citation omitted)). Neither did the *Stern* Court decide whether the public rights exception constitutionally validates any of the powers that bankruptcy judges today exercise. *See* 131 S. Ct. at 2614 n.7 ("We noted [in *Granfinanciera*] that we did not mean to 'suggest that the restructuring of debtor-creditor relations is in fact a public right.' . . . Because neither party asks us to reconsider the public rights framework for bankruptcy, we follow the same approach here."). We, of course, follow the Court's example in declining to take up the question.

*Gen. Petroleum Corp.)*, 40 F.3d 763, 770 (5th Cir. 1994), *withdrawn and replaced by* 52 F.3d 1330 (5th Cir. 1995); *Turner v. Davis, Gillenwater & Lynch (In re Investment Bankers, Inc.)*, 4 F.3d 1556, 1561 (10th Cir. 1993). *But see Leyh*, 52 F.3d at 1336–37; *Gower v. Farmers Home Admin. (In re Davis)*, 899 F.2d 1136, 1140 n.9 (11th Cir. 1990).

Following *Stern*, we can no longer resist *Granfinanciera*'s logic. The issue in *Stern* was whether a bankruptcy court could enter final judgment on a state-law claim for tortious interference with a gift expectancy, which Vickie Marshall had filed as a compulsory counterclaim to Pierce Marshall's proof of claim in her ongoing bankruptcy proceeding. *See* 131 S. Ct. at 2601. The Supreme Court held that it could not, because "Vickie's counterclaim cannot be deemed a matter of 'public right' that can be decided outside the Judicial Branch." *Id.* at 2611. In the course of a lengthy exegesis of its own public-rights precedents, the Court explained that the state-law counterclaim at issue was indistinguishable from the fraudulent conveyance claim in *Granfinanciera*: "Vickie's counterclaim—like the fraudulent conveyance claim at issue in *Granfinanciera*—does not fall within any of the varied formulations of the public rights exception in this Court's cases." *Id.* at 2614. This common character of the claims in *Granfinanciera* and *Stern* means that neither can be consigned to the bankruptcy courts without doing violence to the constitutional separation of powers:

What is plain here is that this case involves the most prototypical exercise of judicial power: the entry of a final, binding judgment *by a court* with broad substantive jurisdiction, on a common law cause of action, when the action neither derives from nor depends upon any agency regulatory regime. If such

an exercise of judicial power may nonetheless be taken from the Article III Judiciary simply by deeming it part of some amorphous "public right," then Article III would be transformed from the guardian of individual liberty and separation of powers we have long recognized into mere wishful thinking.

*Id.* at 2615. Here, the Trustee's fraudulent conveyance claims are not matters of "public right," and, *ipso facto*, cannot be decided outside the Article III courts.[7]

Our conclusion is buttressed by the Supreme Court's equation of litigants' Article III rights with their Seventh Amendment jury trial rights in bankruptcy-related cases. *Granfinanciera* itself drew the comparison explicitly:

Indeed, our decisions point to the conclusion that, if a statutory cause of action is legal in nature, the question whether the Seventh Amendment permits Congress to assign its adjudication to a tribunal that does not employ juries as factfinders requires the

---

[7] Our analysis is unaffected by the Sixth Circuit's recent decision in *Onkyo Europe Electronics GMBH v. Global Technovations Inc. (In re Global Technovations Inc.)*, 694 F.3d 705, 722 (6th Cir. 2012). There, the Sixth Circuit concluded that it was "crystal clear that the bankruptcy court had constitutional jurisdiction under *Stern* to adjudicate whether the sale of GTI was a fraudulent transfer." *Id.* But it was "crystal clear" because "it was not possible . . . to rule on [the creditor's] proof of claim without first resolving the fraudulent-transfer issue." *Id.* (quoting *Stern*, 131 S. Ct. at 2616). That rendered *In re Global* "fundamentally unlike" both *Granfinanciera* and our case, "where the bankruptcy estate reached out to file a fraudulent-transfer claim against a party who had filed no claim against the estate." *Id.*

same answer as the question whether Article III allows Congress to assign adjudication of that cause of action to a non-Article III tribunal. For if a statutory cause of action, such as respondent's right to recover a fraudulent conveyance under 11 U.S.C. § 548(a)(2), is not a "public right" for Article III purposes, then Congress may not assign its adjudication to a specialized non-Article III court lacking "the essential attributes of the judicial power."

492 U.S. at 53. And the Court in *Stern* characterized cases involving Seventh Amendment jury trial rights as binding authority on the Article III issue. *Stern* described *Granfinanciera*—a case about Seventh Amendment rights—as deciding that "Congress could not constitutionally assign resolution of the fraudulent conveyance action to a non-Article III court." 131 S. Ct. at 2614 n.7.

The *Stern* Court again transmuted a Seventh Amendment case into an Article III precedent in its analysis of *Langenkamp v. Culp*, 498 U.S. 42 (1990). *Langenkamp* itself stated that the case "present[ed] the question whether creditors who submit a claim against a bankruptcy estate and are then sued by the trustee in bankruptcy to recover allegedly preferential monetary transfers are entitled to jury trial under the Seventh Amendment." *Id.* at 42–43. On the *Stern* Court's reading, however, *Langenkamp* also decided whether such a claim could be heard in bankruptcy at all: "We explained [in *Langenkamp*] that a preferential transfer claim *can be heard in bankruptcy* when the allegedly favored creditor has filed a claim . . . . If, in contrast, the creditor has not filed a proof of claim, the trustee's preference action does not 'become[ ] part of the claims-allowance process' subject to resolution by the

bankruptcy court." 131 S. Ct. at 2617 (alteration in original) (emphasis added) (quoting *Langenkamp*, 498 U.S. at 45).

*Stern* fully equated bankruptcy litigants' Seventh Amendment right to a jury trial in federal bankruptcy proceedings with their right to proceed before an Article III judge. Hence, *Granfinanciera*'s statement that "[u]nless a legal cause of action involves 'public rights,' Congress may not deprive parties litigating over such a right of the Seventh Amendment's guarantee to a jury trial" is powerful evidence that Congress also may not deprive such parties of their right to an Article III tribunal. 492 U.S. at 53.

Several *amici* object that the claim at issue in *Stern* was a state-law claim, and that the Trustee's § 548 fraudulent conveyance claim is indistinguishable from the preferential transfer claim at issue in *Katchen v. Landy*, 382 U.S. 323 (1966). *Katchen* held that bankruptcy referees acting under the Bankruptcy Acts of 1898 and 1938 could exercise summary jurisdiction over a voidable preference claim brought by a bankruptcy trustee against a creditor who filed proof of claim in the bankruptcy proceeding. *Id.* at 329–30, 332–33. The *Stern* Court did distinguish *Katchen* on the grounds that "the trustee bringing the preference action was asserting a right of recovery created by federal bankruptcy law." 131 S. Ct. at 2618 ("Vickie's claim, in contrast, is in no way derived from or dependent upon bankruptcy law; it is a state tort action that exists without regard to any bankruptcy proceeding."). And *Granfinanciera* noted that actions to recover preferences are "indistinguishable . . . in all relevant respects" from actions to recover fraudulent conveyances. 492 U.S. at 48–49. There is an argument, then, that bankruptcy courts can render final judgment on a fraudulent

conveyance claim whose source of law is the Bankruptcy Code.

That is wrong for two reasons. First, the dispositive distinction between the claims in *Stern* and *Katchen* was that in *Katchen*, the trustee's preference action "would necessarily be resolved in the claims allowance process" because the defendant had filed a proof of claim against the bankruptcy estate. *Stern*, 131 S. Ct. at 2618. The preference action necessarily had to be resolved in the course of deciding whether to allow the defendant's claim on the estate. By contrast, Vickie Marshall's counterclaim in *Stern* required the bankruptcy court to "make several factual and legal determinations that were not disposed of in passing on objections to Pierce's proof of claim for defamation." *Id.* at 2617 (internal quotation marks omitted). "There thus was never reason to believe that the process of ruling on Pierce's proof of claim would necessarily result in the resolution of Vickie's counterclaim." *Id.* at 2617–18.

Second, a rule that classified any federal-law claim as a "public right" would render *Stern* internally contradictory. Assume that the *Stern* Court's observation that "Vickie's claim . . . is in no way derived from or dependent upon bankruptcy law" was the sole basis by which the Court distinguished the counterclaim in that case from the preference action in *Katchen*. If that were so, the *Stern* Court's characterization of the holding in *Granfinanciera*—that "Congress could not constitutionally assign resolution of the fraudulent conveyance action to a non-Article III court," 131 S. Ct. at 2614 n.7—would be incoherent, because the claim in *Granfinanciera* arose under § 548 of the Bankruptcy Code. *See* 492 U.S. at 36.

*Granfinanciera* involved a federal-law claim, and *Stern* involved a state-law claim. But *Stern* held that both claims required an Article III court. Thus, the only principled basis on which to distinguish *Katchen* from *both Stern* and *Granfinanciera* is that *Katchen* involved a claim against a creditor that necessarily had to be resolved in the course of the claims-allowance process, and *Stern* and *Granfinanciera* did not.

In this case, EBIA is a noncreditor to the BIA bankruptcy estate. Hence, it is not subject to the bankruptcy court's equitable jurisdiction; the trustee can recover monies fraudulently conveyed to it only by initiating a legal action. *Cf. Langenkamp*, 498 U.S. at 45 ("If a party does *not* submit a claim against the bankruptcy estate, however, the trustee can recover allegedly preferential transfers only by filing what amounts to a legal action to recover a monetary transfer."). That legal action need not necessarily have been resolved in the course of allowing or disallowing the claims against the BIA estate. For that reason, the claim belonged in an Article III court. *See Stern*, 131 S. Ct. at 2618 ("Congress may not bypass Article III simply because a proceeding may have *some* bearing on a bankruptcy case; the question is whether the action at issue stems from the bankruptcy itself or would necessarily be resolved in the claims allowance process."). That the Trustee asserted a federal-law fraudulent conveyance claim against EBIA is of no moment to our conclusion that the claim is nonadjudicable by a bankruptcy judge.

* * *

Taken together, *Granfinanciera* and *Stern* settle the question of whether bankruptcy courts have the general

authority to enter final judgments on fraudulent conveyance claims asserted against noncreditors to the bankruptcy estate. They do not. We now turn to a subsidiary question: whether bankruptcy judges may constitutionally hear such claims, and prepare recommendations for de novo review by the federal district courts.

## III

Federal law authorizes bankruptcy judges to "hear and determine all cases under title 11 and all core proceedings arising under title 11, or arising in a case under title 11." 28 U.S.C. § 157(b)(1). Bankruptcy judges have the narrower power to "hear" a proceeding that is "not a core proceeding but that is otherwise related to a case under title 11," and to "submit proposed findings of fact and conclusions of law to the district court" for the entry of final judgment. *Id.* § 157(c)(1).

Our conclusion today creates a gap in this framework: Federal law classifies fraudulent conveyance proceedings as "core" proceedings, 28 U.S.C. § 157(b)(2)(H), but the Constitution prohibits bankruptcy judges from entering a final judgment in such core proceedings. Nowhere does the statute explicitly authorize bankruptcy judges to submit proposed findings of fact and conclusions of law in a core proceeding; § 157(c)(1) is expressly limited to "non-core" proceedings. Is the power "to hear and determine" capacious enough to include the power to submit proposed findings in a core proceeding? Or are bankruptcy courts impotent to address fraudulent conveyance proceedings, because they fall in the interstices of § 157?

We have noted that Congress enumerated the examples of core proceedings in § 157(b)(2) with "a view toward expanding the bankruptcy court's jurisdiction to its constitutional limit." *Mankin*, 823 F.2d at 1301; *see also Celotex Corp. v. Edwards*, 514 U.S. 300, 308 (1995). With respect to any bankruptcy-related claim, then, the bankruptcy courts must be vested with as much adjudicatory power as the Constitution will bear. In light of this statutory objective, the power to "hear and determine" a proceeding surely encompasses the power to hear the proceeding and submit proposed findings of fact and conclusions of law to the district court. Section 157(b)(1) empowers bankruptcy courts to "hear and determine" fraudulent conveyance claims in a manner consistent with the strictures of Article III—and that includes the more modest power to submit findings of fact and recommendations of law to the district courts.

In sum, § 157(b)(1) provides bankruptcy courts the power to hear fraudulent conveyance cases and to submit reports and recommendations to the district courts. Such cases remain in the core, and the § 157(b)(1) power to "hear and determine" them authorizes the bankruptcy courts to issue proposed findings of fact and conclusions of law. Only the power to enter final judgment is abrogated.[8]

---

[8] In dicta, the Seventh Circuit has implied that bankruptcy courts cannot propose findings of fact and conclusions of law in any proceeding classified as core by § 157. *See Ortiz v. Aurora Health Care, Inc. (In re Ortiz)*, 665 F.3d 906, 915 (7th Cir. 2011). We do not find the *Ortiz* court's analysis of the issue thoroughly reasoned. *See also Waldman v. Stone*, ___ F.3d ___, 2012 WL 5275241, at *8 (6th Cir. Oct. 26, 2012) (observing in dicta that "§ 157(b)(1) authorizes the bankruptcy court to 'enter appropriate orders and judgments,' not to propose them," but acknowledging that "one might argue that . . . Congress's grant of the greater power to enter final judgments implies a lesser authority to

Our conclusion is consistent with the *Stern* Court's tacit approval of bankruptcy courts' continuing to hear and make recommendations about statutory core proceedings in which entry of final judgment by a non-Article III judge would be unconstitutional. The district court that heard *Stern* before it reached the Supreme Court took the view that the bankruptcy court had lacked the constitutional authority to enter final judgment on Vickie Marshall's counterclaim. *See Stern*, 131 S. Ct. at 2602. For that reason, the district court treated the bankruptcy court's judgment as "proposed[,] rather than final," and reviewed the judgment de novo. *Id.* (alteration in original). Nowhere did the *Stern* Court object to the district court's judgment. Instead, the Court noted that Pierce Marshall "ha[d] not argued that the bankruptcy courts are barred from hearing all counterclaims or proposing findings of fact and conclusions of law on those matters." *Id.* at 2620 (internal quotation marks omitted). Immediately thereafter, the Court explained, "We do not think the removal of counterclaims such as Vickie's from core bankruptcy jurisdiction meaningfully changes the division of labor in the current statute; we agree . . . that the question presented here is a 'narrow' one." *Id.* Stripping the bankruptcy courts of the power to entertain state-law counterclaims in *any* capacity would have roiled the prevailing bankruptcy schema. The Court was surely suggesting that bankruptcy courts were *not* "barred from hearing all counterclaims or proposing findings of facts and conclusions of law on those matters." *Id.* (internal quotation marks omitted); *see also Heller Ehrman LLP v. Arnold & Porter, LLP (In re Heller Ehrman)*, 464 B.R. 348, 355–56 (N.D. Cal. 2011) (noting the near-universal approbation by district courts and bankruptcy courts of the view that *Stern* permits bankruptcy courts to submit reports

propose them.").

and recommendations in bankruptcy-related proceedings even when the entry of final judgment is unconstitutional).

For these reasons, we conclude that bankruptcy courts have statutory authority to hear and enter proposed findings of fact and conclusions of law in a fraudulent conveyance proceeding asserted by a bankruptcy trustee against a noncreditor, subject to de novo review by a federal district court.

## IV

Several *amici* contend that even if defendants in fraudulent conveyance suits have a right to a hearing in an Article III court, that right is waivable. We agree, and hold that EBIA waived its right to an Article III hearing.

The waivable nature of the allocation of adjudicative authority between bankruptcy courts and Article III courts is well established. Prior to the Bankruptcy Act of 1978, federal law distinguished between "summary" matters, which involved property in the actual or constructive possession of the court, and "plenary" matters, which did not. *See Northern Pipeline*, 458 U.S. at 53. Bankruptcy referees were vested with jurisdiction over summary matters, but plenary suits could only be tried by an Article III judge. But the right to an Article III judge in plenary proceedings could be waived by the litigants. *See MacDonald v. Plymouth County Trust Co.*, 286 U.S. 263, 267 (1932).

Following the genesis of the modern bankruptcy system, the Supreme Court clarified that "Article III, § 1's guarantee of an independent and impartial adjudication by the federal judiciary of matters within the judicial power of the United

States . . . serves to protect primarily personal, rather than structural, interests." *Schor*, 478 U.S. at 848.[9] *Stern* further made clear that § 157 "does not implicate questions of subject matter jurisdiction." 131 S. Ct. at 2607. Accordingly, "as a personal right, Article III's guarantee of an impartial and independent federal adjudication is subject to waiver."[10] *Schor*, 478 U.S. at 848; *see also Daniels-Head & Assocs. v. William M. Mercer, Inc. (In re Daniels-Head & Assocs.)*, 819 F.2d 914, 918 (9th Cir. 1987). And in fact, § 157(c)(2) expressly provides that bankruptcy courts may enter final judgments in non-core proceedings "with the consent of all the parties to the proceeding." 28 U.S.C. § 157(c)(2).

---

[9] *Schor* did hold that "notions of consent and waiver cannot be dispositive" of Article III problems when "the encroachment or aggrandizement of one branch at the expense of the other" is at stake, because in such cases structural principles are implicated in addition to private rights entitlements. 478 U.S. at 850–51, 860 (internal quotation marks omitted). In fact, that was the case in *Schor*, because the case involved whether an Executive Branch administrative agency could adjudicate a state-law counterclaim. *Id.* at 852. But the allocation of authority between bankruptcy courts and district courts does not implicate structural interests, because bankruptcy judges are "officer[s] of" the district court and are appointed by the Courts of Appeals. *See* 28 U.S.C. § 151, 152(a)(1).

[10] The same principle permits federal magistrate judges, acting with the consent of the litigants, to enter final judgments in proceedings that would otherwise be the exclusive province of Article III courts. *See* 28 U.S.C. § 636(c)(1); *Pacemaker Diagnostic Clinic of Am., Inc. v. Instromedix, Inc.*, 725 F.2d 537, 547 (9th Cir. 1984) (en banc) ("We hold that consensual reference of a civil case to a magistrate is constitutional . . . ."). And consent to a magistrate judge's case-dispositive authority may be implied from a litigant's actions. *See Roell v. Winthrow*, 538 U.S. 580, 586–87 (2003).

If consent permits a non-Article III judge to decide finally a non-core proceeding, then it surely permits the same judge to decide a core proceeding in which he would, absent consent, be disentitled to enter final judgment. The only question, then, is whether EBIA did in fact consent to the bankruptcy court's jurisdiction.

We have previously held that a bankruptcy litigant impliedly consents to the bankruptcy court's jurisdiction when he fails to timely object. In *In re Daniels-Head*, 819 F.2d at 919, we held "that appellant's failure to object to the bankruptcy court's jurisdiction constitutes consent to that jurisdiction." Similarly, in *Mann v. Alexander Dawson Inc. (In re Mann)*, 907 F.2d 923, 926 (9th Cir. 1990), we held that a debtor's decision to file an adversary proceeding in bankruptcy court, and his failure to object to the court's jurisdiction prior to the time it rendered judgment against him, meant that "he consented to the court's jurisdiction." *Id.*

This case, of course, is somewhat different, because the Trustee, not EBIA, initiated the adversary proceeding. But EBIA's conduct bore considerable indicia of consent. EBIA initially demanded a jury trial, invoking its rights under *Granfinanciera*, which the district court treated as a motion to withdraw the reference. *See* Defs.' Answer at 14, *In re Bellingham Ins. Agency*, No. 06-11721 (Bankr. W.D. Wash. Aug. 2, 2008), ECF No. 169; Mot. to Withdraw the Reference, *Arkison v. Exec. Benefits Ins.*, No. 10-cv-00171 (W.D. Wash. Jan. 28, 2010), ECF No. 1. But EBIA elected not to pursue a hearing in an Article III court. Instead, EBIA petitioned the district court to stay its consideration of the motion to withdraw the reference to give the bankruptcy court time to adjudicate the Trustee's motion for summary judgment. *See* Order, *Arkison v. Exec. Benefits Ins.*, No. 10-

cv-00171 (W.D. Wash. Mar. 26, 2010), ECF No. 5. In other words, EBIA did not simply fail to object to the bankruptcy judge's authority to enter final judgment in the fraudulent conveyance action; it affirmatively assented to suspend its demand for a jury trial in district court to give the bankruptcy judge an opportunity to adjudicate the claim.

A month later, the bankruptcy court entered summary judgment in Arkison's favor. EBIA abandoned its motion to withdraw the reference, and the district court dismissed the action. *See* Order, *Arkison v. Exec. Benefits Ins.*, No. 10-cv-00171 (W.D. Wash. July 2, 2010), ECF No. 8. EBIA then separately appealed the bankruptcy court's judgment in the district court for the Western District of Washington. EBIA did not argue at any point during that appeal that the bankruptcy court lacked authority to issue a final judgment in the fraudulent conveyance action. In fact, EBIA did not raise a constitutional objection to the bankruptcy court's entry of final judgment in favor of the Trustee until after the briefing in this appeal was complete, when it filed a motion to vacate the bankruptcy court's judgment on the eve of oral argument. Because EBIA waited so long to object, and in light of its litigation tactics, we have little difficulty concluding that EBIA impliedly consented to the bankruptcy court's jurisdiction. *See United States v. Olano*, 507 U.S. 725, 731 (1993) ("'No procedural principle is more familiar to this Court than that a constitutional right,' or a right of any other sort, 'may be forfeited . . . by the failure to make timely assertion of the right before a tribunal having jurisdiction to determine it.'" (quoting *Yakus v. United States*, 321 U.S. 414, 444 (1944))). *Cf. In re Ortiz*, 665 F.3d at 909–10, 915 (refusing to find implied consent to a bankruptcy judge's authority where the debtors moved for the bankruptcy judge

to abstain from jurisdiction and petitioned the district court to withdraw the reference from the bankruptcy judge).

There are two potential objections to our conclusion that EBIA impliedly consented to the bankruptcy judge's authority. The first is that Federal Rules of Bankruptcy Procedure 7008 and 7012, which implement the statutory core/non-core dichotomy, preclude a finding of implied consent. These rules provide that an adversary proceeding complaint "shall contain a statement that the proceeding is core or non-core and, if non-core, that the pleader does or does not consent to entry of final orders or judgment by the bankruptcy judge"; a similar requirement applies to responsive pleadings. *See* Fed. R. Bankr. P. 7008(a), 7012(b). A 1987 advisory committee note to Rule 7008 provides that "only express consent in the pleadings or otherwise is effective to authorize entry of a final order or judgment by the bankruptcy judge in a non-core proceeding."

We have subsequently held, however, that a litigant's actions may suffice to establish consent. *See In re Mann*, 907 F.2d at 926; *accord In re Tex. Gen. Petroleum Corp.*, 52 F.3d at 1337; *Abramowitz v. Palmer*, 999 F.2d 1274, 1280 (8th Cir. 1993); *Canal Corp. v. Finnman (In re Johnson)*, 960 F.2d 396, 403 (4th Cir. 1992).

Indeed, *Roell*—decided in 2003—precludes any objection on the basis of the bankruptcy rules. 538 U.S. at 586. At the time *Roell* was decided, Federal Rule of Civil Procedure 73(b) specified that if parties consented to a magistrate judge's dispositive power over their case, their consent was required to "be memorialized in 'a joint form of consent or separate forms of consent setting forth such election.'" 538 U.S. at 586 (quoting Fed. R. Civ. P. 73(b) (2003)). The

Federal Magistrate Act, however, stated only that "[u]pon the consent of the parties, a full-time United States magistrate judge . . . may conduct any or all proceedings in a jury or nonjury civil matter and order the entry of judgment in the case, when specially designated to exercise such jurisdiction by the district court." 28 U.S.C. § 636(c)(1). Noting that "§ 636(c)(1)[] speaks only of 'the consent of the parties,' without qualification as to form," the Court held that implied consent could satisfy the statute, notwithstanding the specific procedure described in Rule 73(b). *Roell*, 538 U.S. at 586.

Like the provision of the Federal Magistrate Act at issue in *Roell*, the text of § 157(c) only requires consent simpliciter. *See* 28 U.S.C. § 157(c)(2) (requiring "the consent of all the parties to the proceeding"). By contrast, § 157(e) permits bankruptcy judges to conduct jury trials "with the *express* consent of all the parties" (emphasis added). The adjectival distinction suggests that Congress intended to allow parties to consent by their actions to the authority of bankruptcy courts to enter dispositive orders on any bankruptcy-related claim. Accordingly, in cases like this one—in which the defendant was aware of its right to seek withdrawal of the reference but opted instead to litigate before the bankruptcy court—consent is established.

The second potential objection is that *Stern* was not decided until EBIA's appeal was pending before this court. True, but EBIA had ample reason to be alert to the possible jurisdictional problem. We published *Marshall v. Stern*, 600 F.3d 1037 (9th Cir. 2010), on March 19, 2010, before EBIA asked the district court to stay its motion to withdraw the reference. That predicate opinion featured a lengthy perscrutation of the Article III question. Although we reached a different set of conclusions than the Supreme Court

ultimately did, the opinion should have been sufficient to alert EBIA to the possible jurisdictional problem. The same is true of *Granfinanciera*, which thoroughly foreshadowed the result in *Stern*. And we know that EBIA's counsel was aware of *Granfinanciera*, because the company asserted—and then abandoned—the very Seventh Amendment right that case established.

Further, the *Stern* Court applied the doctrine of litigant consent even when little authority existed to notify the litigant that a constitutional objection was there for the making. In *Stern*, Pierce Marshall propounded the novel argument that the bankruptcy court lacked jurisdiction to enter final judgment on his defamation claim because § 157(b)(5) granted to district courts exclusive jurisdiction over "personal injury tort" claims. 131 S. Ct. at 2606. The Court held that Pierce consented to the bankruptcy court's jurisdiction over the claim when he failed to timely object. *Id.* at 2608. By contrast, Pierce voiced his objection to the bankruptcy court's jurisdiction over Vickie's counterclaim from the outset of the litigation. *See id.* at 2601.

Although EBIA may not be as sophisticated or creative as Pierce, it fully litigated the fraudulent conveyance action before the bankruptcy court and the district court, without so much as a peep about Article III—even going so far as to abandon its motion to withdraw the reference. "[T]he consequences of a litigant sandbagging the court—remaining silent about his objection and belatedly raising the error only if the case does not conclude in his favor—can be . . . severe." *Id.* at 2609 (internal quotation marks, alterations, and citations omitted). Having lost before the bankruptcy court, EBIA cannot assert a right it never thought to pursue when it still believed it might win. *Id.*

**V**

Because we conclude that EBIA consented to the bankruptcy court's jurisdiction, we proceed to the merits of that judgment.

**A**

The district court affirmed the bankruptcy court's grant of summary judgment on the claim that the transfer of BIA's assets to EBIA constituted a fraudulent transfer. *See* 11 U.S.C. § 548. Section 548 empowers the trustee to avoid a transfer of the debtor's property, or any obligation incurred by the debtor, that was fraudulently made or incurred within two years of the bankruptcy petition. A trustee may exercise the avoidance power when the transfer was actually intended to hinder, delay, or defraud a creditor. *Id.* § 548(a)(1)(A). Even in the absence of actual fraudulent intent, the trustee can avoid a "constructively" fraudulent transfer: one that was made in exchange for less than "reasonably equivalent value" at a time when the debtor was insolvent. *Id.* § 548(a)(1)(B).

The district court held that the trustee satisfied all elements of a constructively fraudulent transfer, because BIA transferred to EBIA all of its assets when EBIA began operating in February 2006, including its phone number, book of business, and especially its stream of insurance commissions. BIA received nothing in return.

EBIA's only defense is that it received no items of value from BIA prior to the filing of the bankruptcy petition. EBIA argues first that any commission streams that changed hands were transferred to the related entity ARIS, not to EBIA, and

second that everything else that was transferred was either a liability or an asset with negligible value.[11]

EBIA's assertions are belied by the record. EBIA is correct that the Trustee's expert accountant, Michael Quackenbush, testified that $373,291.28 was deposited into an account held jointly by ARIS and EBIA. But, as the district court correctly noted, those commissions were credited to EBIA via intercompany transfers in the accounting software. The evidence that this money was transferred from BIA to EBIA is overwhelming. BIA executed a written assignment of its commissions from a major client to an employee, Peter Pearce, who immediately became an EBIA employee upon BIA's dissolution. Pearce deposited $123,133.58 into the ARIS/EBIA account. And EBIA itself deposited more than $250,000 in additional commissions that obviously belonged to BIA.

EBIA is entitled to any reasonable inference that would suggest an explanation of the provenance of these sums other than the one the Trustee proposes. *See Bodett v. CoxCom, Inc.*, 366 F.3d 736, 742 (9th Cir. 2004). But EBIA makes no serious attempt to offer a nonfraudulent explanation. EBIA's only rebuttal evidence is the declaration of erstwhile BIA CEO Nicholas Paleveda, who claims that the commissions Pearce deposited into the account belonged to Pearce personally. In his declaration, he also asserts that the remaining quarter-million dollars of commissions credited to EBIA between January 1 and June 1 came from new business

---

[11] EBIA's piteous examples of such assets include "unemployed actuaries" and "a lease arrangement . . . for an office that no clients visited." Appellant's Opening Br. 9.

that the company drummed up without relying on BIA's old business relationships.

Both claims are incredible. Property of the estate includes intangible assets, such as corporate goodwill and a "book of business." *See Stoumbos v. Kilimnik*, 988 F.2d 949, 963–64 (9th Cir. 1993). The transfer of an ongoing business concern can constitute a fraudulent transfer. *See, e.g.*, *id.* The Trustee produced to the bankruptcy court the document assigning the commissions from BIA's client American National to Pearce, and various witnesses testified that Pearce's role at BIA was to act as a conduit for commissions between the company and its clients. Further, Paleveda stated that EBIA did not earn any revenue until May 2006. Paleveda thus suggests that in a matter of weeks—from May to June 1—EBIA earned hundreds of thousands of dollars of new commissions that were unrelated to BIA's old business.

Put simply, there is no genuine dispute of material fact that these transfers were constructively fraudulent and recoverable by the Trustee under § 548. *See Stoumbos*, 988 F.2d at 953.

The bankruptcy court also granted summary judgment on the Trustee's claim that EBIA violated Washington's Uniform Fraudulent Transfer Act, Wash. Rev. Code §§ 19.40.011–19.40.904. The definition of a constructively fraudulent transfer under the Washington Uniform Fraudulent Transfer Act is essentially identical to the definition of a constructively fraudulent transfer under § 548 of the Bankruptcy Code. It is any transfer that is made "[w]ithout receiving a reasonably equivalent value in exchange for the transfer or obligation" while the debtor:

(i) Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or

(ii) Intended to incur, or believed or reasonably should have believed that he or she would incur, debts beyond his or her ability to pay as they became due.

*Id.* § 19.40.041(a)(2).

EBIA does not argue in its briefs that we ought to distinguish between the state- and federal-law causes of action. We therefore conclude that the district court properly affirmed the bankruptcy court's grant of summary judgment on the Trustee's state-law constructive fraudulent transfer claim.

The district court also concluded that the Trustee adduced sufficient evidence to demonstrate actual fraudulent intent by BIA. Our conclusion that the transfers to EBIA were constructively fraudulent under Washington law is a sufficient basis on which to affirm the judgment. *See Thompson v. Hanson*, 219 P.3d 659, 664 (Wash. 2009). Hence, we need not reach the question of whether the transfers were actually fraudulent.

**B**

In addition to addressing the Trustee's fraudulent conveyance claims, the bankruptcy court granted summary judgment on the Trustee's claim that EBIA was a successor corporation of BIA, and therefore liable for the latter's debts. We agree that EBIA is BIA's successor.

The rule in Washington is that "a corporation purchasing the assets of another corporation does not become liable for the debts and liabilities of the selling corporation." *Cambridge Townhomes, LLC v. Pac. Star Roofing, Inc.*, 209 P.3d 863, 868 (Wash. 2009). An exception is made, however, when "the purchaser is a mere continuation of the seller." *Id.* (internal quotation marks omitted). Several factors dictate whether a business is a "mere continuation" of its predecessor, including "a common identity between the officers, directors, and stockholders of the selling and purchasing companies, and the sufficiency of the consideration running to the seller corporation in light of the assets being sold." *Id.* The nub of the inquiry is whether "the purchaser represents merely a 'new hat' for the seller." *Cashar v. Redford*, 624 P.2d 194, 196 (Wash. Ct. App. 1981) (internal quotation marks omitted).

EBIA marshals a variety of facts in an attempt to prove that the two companies are authentically distinct entities. For instance, EBIA notes that none of BIA's seven shareholders became EBIA shareholders. EBIA also adopted a radically different business image, including a "completely different name" and a new logo and website. Finally, EBIA remarks that its business model represents a sea change from BIA's, because BIA focused exclusively on 412(i) retirement plans, while EBIA traffics in a broader range of defined-benefit retirement plans.

EBIA is indulging in what Freud called the narcissism of minor differences.[12] EBIA's statement that there were no common shareholders between the two entities is technically true but deeply misleading. Paleveda was the sole owner of

---

[12] SIGMUND FREUD, ON SEXUALITY 272 (Penguin ed. 1991).

EBIA and the CEO of BIA prior to EBIA's incorporation; his wife, Marjorie Ewing, owned eighty percent of BIA. Because a "common identity of the officers, directors, and stockholders" is the "crucial factor" in the "mere continuation" judgment, *Cashar*, 624 P.2d at 196, the fact that the same married couple owned and operated both BIA and EBIA is virtually dispositive. In any case, a variety of other factors militate in favor of a finding of successor liability. The core employees remained the same, there was no consideration paid for BIA's transfer of assets, and the essential business—marketing and selling defined-benefit plans funded by insurance policies—remained the same. *Cf. Cambridge Townhomes*, 209 P.3d at 869.

Weighed against these fundamental commonalities, minor divergences like the company names, logos, and websites are immaterial. The evidence shows that EBIA was nothing more than a "new hat" for Paleveda and Ewing. The bankruptcy court correctly granted summary judgment to the Trustee on the issue of successor liability.

## VI

Fraudulent conveyance claims are "quintessentially suits at common law" designed to "augment the bankruptcy estate." *Granfinanciera*, 492 U.S. at 56. Thus, Article III bars bankruptcy courts from entering final judgments in such actions brought by a noncreditor absent the parties' consent. But here EBIA consented to the bankruptcy court's jurisdiction, rendering that court's entry of summary judgment in favor of the Trustee constitutionally sound. That judgment was also correct.

**AFFIRMED**.