**In re WASHINGTON COAST I, L.L.C.; Structural Investments & Planning IV, L.L.C., Debtors.**

**Resource Funding, Inc., Appellant,**

v.

**Pacific Continental Bank; Sonas Capital Group, LLC, Appellees.**

**BAP No. AZ–11–1529–JuBrD. Bankruptcy Nos. 08–18608–GBN, 09–01035–GBN. Adversary No. 09–00553–GBN.**

United States Bankruptcy Appellate Panel of the Ninth Circuit.

Argued and Submitted Sept. 19, 2012.

Decided Dec. 18, 2012.

Susan J. Williams, Esq., of Hennelly & Grossfeld LLP, Marina del Rey, CA, argued for Appellant Resource Funding, Inc.; Scott K. Brown, Esq., of Lewis and Roca LLP, Phoenix, AZ, argued for Appellee Pacific Continental Bank; Richard M. Lorenzen, Esq., of Perkins Coie LLP, Phoenix, AZ, appeared for Appellee Sonas Capital Group, LLC.

Before JURY, BRAND **, and DUNN, Bankruptcy Judges.

## OPINION

JURY, Bankruptcy Judge.

Plaintiff-appellee, Pacific Continental Bank (PCB), filed an adversary proceeding (PCB Adversary) against defendant-appellant, Resource Funding, Inc. (RF), seeking to establish its first lien priority in proceeds from the postpetition sale of real property (Lot #173) owned by debtor, Washington Coast I, LLC (Washington Coast), and in other properties owned by Washington Coast and Structural Investments & Planning IV, LLP (SIP IV) (collectively, we refer to Washington Coast and SIP IV as Debtors). The PCB Adversary related to a series of loan transactions by and among plaintiff-in-intervention and appellee, Sonas Capital Group, LLC (Sonas), PCB, RF, and Debtors. After a trial, the bankruptcy court entered a final judgment finding in favor of PCB. This appeal followed.

On appeal, RF seeks to have us set aside the final judgment (or dismiss the PCB Adversary) on the theory that the bankruptcy court, as a non-Article III court, lacked authority to enter the judgment under the holding in *Stern v. Marshall,* —— U.S. ——, 131 S.Ct. 2594, 180 L.Ed.2d 475 (2011). Alternatively, RF requests us to reverse and remand the matter to the bankruptcy court because the judgment exceeded the relief sought in PCB's first amended complaint (FAC) and the parties' joint pretrial statement.

We disagree with both contentions. We conclude that the lien priority dispute does not fall within the narrow holding of *Stern.* We also decide that even if *Stern* did apply, RF waived or forfeited its right to challenge for the first time on appeal the bankruptcy court's statutory and constitutional authority to enter a final judgment in the PCB Adversary. Finally, we decide that the final judgment did not exceed the relief sought in the FAC. Accordingly, we AFFIRM.

## I. FACTS

### A. The Prepetition Loan Transactions

Between December 2004 and March 2006, Sonas, a "hard money" lender, entered into a series of loan transactions with SIP IV and Pacific Crest I Development LLC (Pacific Crest) for the purpose of acquiring or developing real property. The loans were evidenced by promissory notes and secured by deeds of trust recorded against several parcels of real property located in Pacific County, Washington (Washington Property). Under a loan modification agreement dated December 19, 2006, Pacific Crest confirmed that it transferred its interest in certain parcels to Washington Coast and Washington Coast confirmed it was liable on the promissory notes and deeds of trust.

On September 28, 2005, Sonas and PCB executed a Business Loan Agreement and

** Hón. Julia W. Brand, Bankruptcy Judge for the Central District of California, sitting by designation.

related loan documents, whereby PCB extended a revolving line of credit to Sonas with a maximum principal amount of $5,000,000. As security for the loan, Sonas entered into a Commercial Pledge Agreement dated September 28, 2005, which provided that the collateral for PCB's loan to Sonas included, among other things, the Sonas deeds of trust secured by the Washington Property. As part of the transaction, Sonas assigned the deeds of trust to PCB pursuant to five separate assignments (Assignments) which were recorded in the Pacific County records in 2005.

In December 2006, RF loaned $5,000,000 to Washington Coast, SIP IV, Structural Investments, Inc. (Structural), Donald Davis and Matthew Doney (collectively, the Doney Affiliates). The loan was evidenced by a note (RF Note) which was secured in part by development property located in Salem, Oregon (Oregon Property).[1] As additional security for the loan, Debtors executed deeds of trust (RF Deeds of Trust) against the Washington Property, which RF required to be in first lien priority. The Washington Property consisted of three parcels. Washington Coast owned two of the parcels known as the Henningsgaard parcel (Lot # 173) and the Morse parcel (Lot # 187) and SIP IV owned the third parcel known as the Chelson parcel (Lot # 189). RF recorded its deeds of trust against these properties in late December 2006.

In connection with this transaction, the Doney Affiliates obtained Sonas' agreement to subordinate its deeds of trust to the RF Deeds of Trust in an attempt to satisfy RF's requirement of first lien priority. Although Sonas had assigned the deeds of trust to PCB as collateral for the PCB–Sonas loan, Sonas alone entered into the Subordination Agreement with RF which provided, among other things, that notice of default on the RF loan would be given to Sonas and that RF would proceed against the Oregon Property before seeking to foreclose upon the Washington Property. PCB was not a party to the Subordination Agreement and did not sign it.

The Subordination Agreement was recorded in late December 2006. RF obtained a title policy insuring its first lien position on the Washington Property.

RF commenced foreclosure proceedings on the Oregon Property in 2007. The foreclosure proceedings were stayed by the involuntary chapter 11 petition filed against Structural on December 7, 2007.

On July 3, 2008, Sonas filed a lawsuit against RF in the Pacific County Washington Superior Court (Wash. Sup.Ct. Case No. 08-2-00232-4), alleging, among other things, that RF violated the default notice provisions contained in the Subordination Agreement. Sonas sought a declaratory judgment that the Subordination Agreement had no effect and that its assignments of its deeds of trust to PCB were senior to any lien that RF may have or assert.

**B. Bankruptcy Events**

On December 22, 2008, Washington Coast filed its chapter 11[2] petition. On

---

1. RF's loan to the Doney Affiliates was used by Structural to purchase the Oregon Property. On December 7, 2007, creditors filed an involuntary chapter 11 petition against Structural in the Arizona bankruptcy court (Bankr. Case No. 2:07–bk–06627). The bankruptcy court entered an order for relief on May 13, 2008. RF sought and obtained a relief from stay order with respect to the Oregon Property in the case. On July 2, 2009, the bankruptcy court dismissed Structural's bankruptcy case because the court had granted relief from stay as to all of Structural's properties and its operations had shut down.

2. Unless otherwise indicated, all chapter and section references are to the Bankruptcy

January 14, 2009, Washington Coast filed its Schedules which listed PCB as a secured creditor against "Vacant Lot # 173" in an "unknown" amount and "Sonas Capital Subordination/Resource Funding" as a separate creditor also secured by Lot # 173. On January 22, 2009, SIP IV filed its chapter 11 petition. On June 9, 2010, the bankruptcy court ordered joint administration of Debtors' bankruptcy cases.

## Sale of Lot # 173 Free and Clear of Liens

Shortly after its filing, on January 13, 2009, Washington Coast filed a motion to sell Lot # 173 free and clear of liens under § 363(b) and (f)(4) to the State of Washington for $975,000.[3] In the motion, Washington Coast stated that RF alleged a first mortgage lien in the approximate amount of $5,000,000 on Lot # 173, which was also secured by other property located in Oregon and Washington. Washington Coast maintained that RF agreed to accept $904,460.26 to release its lien on Lot # 173. In addition, Washington Coast acknowledged that Sonas also alleged a first mortgage lien on Lot # 173 in the approximate amount of $1,731,914.80. However, Washington Coast disputed Sonas' lien. There were also numerous judgment liens against the property.

In response to the sale motion, RF agreed that the sale of Lot # 173 should proceed, but asserted

[S]eparate and distinct from whatever claims/defenses that the Debtor alludes to in the Motion concerning the validity and enforceability of the Sonas lien, any

such lien claimed by Sonas is subject to a subordination agreement in favor of Resource Funding, that was executed by Sonas and properly recorded ... As such, the subordination agreement is fully enforceable pursuant to 11 U.S.C. § 510(a).

On January 27, 2009, the bankruptcy court approved the sale with the liens of PCB and RF attaching to the proceeds pending further orders by the court.

On May 6, 2009, Washington Coast filed a report of sale showing that the sale of Lot # 173 was consummated. On June 29, 2009, the sale proceeds were transferred to the court's registry and held pursuant to a stipulated order.

## The PCB Adversary

Shortly after the sale of Lot # 173 was consummated, on May 21, 2009, PCB filed an adversary complaint against RF seeking to establish its first lien priority in the sale proceeds. On May 27, 2009, PCB filed its FAC. The FAC alleged that the lien priority dispute was a core proceeding under 28 U.S.C. § 157(b)(2)(K) and that the proceeding "arises out of and is related to the Chapter 11 case." The prayer for relief sought "[a] judgment from this Court evidencing that the Subordination Agreement has no effect on PCB's interest in the Deeds of Trust and the Property and, therefore, PCB's interest in the Deeds of Trust and the Property by virtue of the Assignments [has] priority over [RF's] interest."

Code, 11 U.S.C. §§ 101–1532. "Rule" references are to the Federal Rules of Bankruptcy Procedure and "Civil Rule" references are to the Federal Rules of Civil Procedure.

**3.** Debtors later filed a § 363 motion to sell Lots # 187 and # 189 to the State of Washington for $2,700,000. On July 30, 2010, the bankruptcy court approved the sale of a por-

tion of Lot # 189. On September 14, 2011, the bankruptcy court entered an order authorizing the sale of the remaining portion of Lot # 189 and all of Lot # 187. The proceeds from these sales were transferred to the court registry. As described below, Lots # 187 and # 189 were also subject to the lien dispute between PCB and RF.

On August 14, 2009, RF answered the FAC, admitting that the lien priority dispute was a core proceeding under 28 U.S.C. § 157(b)(2)(K). RF alleged defenses to PCB's first lien priority under theories of estoppel, ratification and agency. RF did not assert any counterclaims against PCB.

On February 2, 2010, RF sought to join Sonas as a plaintiff to the PCB adversary under Rule 7019 due to Sonas' pending state court lawsuit against RF. PCB objected to the joinder. On March 5, 2010, the bankruptcy court denied the motion.

Sonas then filed a motion to intervene as a plaintiff. Over the objection of PCB, the bankruptcy court granted Sonas' motion.[4]

On December 14, 2010, the parties filed a joint pretrial statement. The statement noted that the bankruptcy court recently approved the sale of other parcels (besides Lot # 173) and that although that sale had not yet closed, the legal and factual issues regarding lien priority as to those parcels was the same as Lot # 173. Plaintiffs asked the court to exercise its discretion and conform its judgment to all three parcels even though the FAC referred only to Lot # 173.[5] The joint pretrial statement further stated that "[t]his is a core proceeding within the meaning of 28 U.S.C. § 157(b)(1)."

On December 17, 2010, the bankruptcy court held a trial, followed by briefing on certain evidentiary matters[6] as well as closing arguments.

On June 23, 2011, the United States Supreme Court issued its decision in *Stern v. Marshall.* This decision affirmed the

Ninth Circuit's March 2010 decision, *Marshall v. Stern (In re Marshall),* 600 F.3d 1037 (9th Cir.2010), holding that the bankruptcy court lacked core authority over state law counterclaims such as Vickie Marshall's.

On June 30, 2011, the bankruptcy court issued an order advising the parties that it would rule in favor of the Plaintiffs on the priority issue.

On July 26, 2011, the bankruptcy court issued the Findings of Fact and Conclusions of Law (FFCL) and Order. In the FFCL, the bankruptcy court found that PCB's Assignments were recorded prior to RF's Subordination Agreement and that RF knew about the Assignments before the Subordination Agreement was recorded. The court further found that RF failed to establish an equitable theory that would allow the court to disregard PCB's prior position. In its conclusions of law, the bankruptcy court found that the adversary proceeding was a core proceeding under 28 U.S.C. § 157(b)(2)(K) and stated that "[n]o party has questioned this court's jurisdiction." In addition, the court concluded that "PCB has established its case of first lien priority in the proceeds." The FFCL also stated that the court's findings established the law of the case and would be followed by the court in similar lien disputes arising in the jointly administered cases that involved the same parties and similar facts and law.

On August 11, 2011, RF filed a motion for reconsideration of the FFCL. RF requested the court to clarify the FFCL "so as to leave no doubt" that it did not negoti-

---

4. Hereinafter, we refer to PCB and Sonas collectively as Plaintiffs.

5. Although this request was in the "joint" pretrial statement, it was a unilateral request by the Plaintiffs and the statement does not reflect joinder from RF.

6. After trial, the parties filed a stipulated amendment to the joint pretrial statement which revised their deposition designations and objections thereto.

ate the Subordination Agreement or its loan to Washington Coast with any representative of Sonas or its attorneys. RF challenged the following finding of fact in ¶ 23:

A few days after the Doney/Lynch conversations, a subordination agreement was delivered to Sonas. *After initially refusing to sign, following negotiations between Sonas' attorney and RF[,] Lynch signed the subordination.*

FFCL ¶ 23 (emphasis added). Plaintiffs objected to the motion on the ground that the bankruptcy court made the finding based on a deposition transcript that was designated by RF and came into evidence without objection by PCB. However, Plaintiffs agreed to an amendment of the findings of fact which would leave out reference to negotiations between Sonas' attorney and RF. They proposed that instead the sentence should read "[a]fter initially refusing to sign, following negotiations Lynch signed the subordination."

On September 1, 2011, the bankruptcy court held a hearing on the matter. The court observed that it relied on the deposition transcript in making its finding, but agreed that the parties could resolve the issue by inserting Plaintiffs' alternative sentence. The bankruptcy court granted RF's motion for reconsideration of the findings of fact in part by amendment of the one paragraph and entered the order on September 8, 2011.

Meanwhile, Plaintiffs had submitted a proposed form of final judgment. Paragraph 1 of the proposed judgment contained a sentence stating "Pacific Continental Bank's interest is superior to any interest Defendant may have." RF objected to this language on the ground that it could be construed to resolve issues concerning PCB's present right to the sale proceeds which were not dealt with in the adversary.

In this regard, RF maintained that PCB did not have standing to assert a claim against proceeds from the sale of Lot # 173 because PCB had not yet foreclosed on its collateral interest in the Sonas deeds of trust. RF also argued that PCB should be required to marshal its collateral as security for the PCB–Sonas loan from other sources before it could lay claim to the sale proceeds. Specifically, PCB had entered into a Forbearance and Loan Modification Agreement with Sonas and guarantors of the PCB–Sonas loan, including an affiliate by the name of Realvest Corporation, in which Sonas granted additional collateral in the so-called Marina and the Cowlishaw properties. PCB also had a collateral assignment of a Sonas deed of trust against the Farr property. RF alleged that PCB was required to foreclose against these other properties prior to claiming any portion of the proceeds of the sale. Accordingly, RF requested that the sentence quoted above be deleted from the judgment.

In opposition, Plaintiffs argued that whether PCB had to foreclose on the Assignments from Sonas before it could access the sale proceeds was not presently before the court. They maintained that the judgment did not address the issues raised by RF or order the payment of the proceeds to PCB. They further argued that the joint pretrial statement defined the scope of the litigation as an adjudication of the priority between two lenders as to the sale proceeds and noted that the sale proceeds were being held pending a determination of lien priority. However, in the end, Plaintiffs agreed to delete the sentence in the judgment regarding PCB's superior interest.

The bankruptcy court authorized the proposed amendment by deleting the purported offensive sentence. The court overruled the remainder of RF's objection

finding that the relief granted was consistent with the relief requested. On September 12, 2011, the bankruptcy court entered the final judgment. On September 26, 2011, RF filed its timely notice of appeal.

### Disbursement of the Sale Proceeds [7]

■ On January 20, 2012, Debtors moved to authorize disbursement of the sale proceeds from the various lots to PCB and surcharge its collateral under § 506(c). The basis for the motion was that PCB's secured claim of $4,202,961.85 was accruing interest at the rate of 6.5% per annum, or approximately $748.47 per day. To reduce the accruing interest, PCB agreed to accept $3,000,000 from the sale proceeds. In addition, although the bankruptcy court had not yet determined that PCB was entitled to the proceeds from Lots # 187 and # 189 as a first priority lien holder, Debtors opined that based on the court's finding in the PCB Adversary, it was inescapable that the court would make such a determination.

RF objected to the motion on several grounds, including, among others that PCB was not a creditor of Debtors' estates and that PCB should be required to marshal the Farr property.

On February 22, 2012, PCB responded by noting that the final judgment determined first lien priority in the sale proceeds for Lot # 173, but it did not authorize the disbursement of the proceeds from the sale of Lot # 173, which was the purpose of Debtors' motion. PCB also noted that RF's arguments regarding whether PCB was entitled to the proceeds (i.e., that PCB must foreclose on its interests in the Sonas deeds of trust; that PCB must marshal against Debtors' other assets; and that PCB was not a creditor) were now

ripe for the bankruptcy court's determination.

On March 20, 2012, the bankruptcy court heard the matter and approved the disbursement of the sale proceeds to PCB and the surcharge under § 506(c). On March 28, 2012, the bankruptcy court entered the order.

Three days later, RF objected to the order contending, among other things, that the order should be without prejudice to RF's challenging the propriety and amount of Sonas' proofs of claim filed against Debtors. On April 12, 2012, the bankruptcy court heard RF's objection. On April 18, 2012, the bankruptcy court entered an amended order stating that the disbursement of funds was without prejudice to RF objecting to the propriety and amount of Sonas' proofs of claim against Debtors. The order further stated that in the event this Panel reverses the judgment in this appeal, PCB and Debtors' counsel were required to return the respective amounts disbursed to them pursuant to the order and without prejudice to their seeking additional disbursements at a future date. The disbursement order was not appealed.

### Debtors' Disclosure Statement and Plan of Reorganization

On April 18, 2012, the bankruptcy court approved Debtors' first amended disclosure statement in support of Debtors' first amended chapter 11 reorganization plan dated March 16, 2012. The first amended disclosure statement shows that on July 2, 2010, Debtors commenced an avoidance adversary proceeding against RF, alleging, among other things, that the lien positions asserted by RF against the estates' properties were avoidable as fraudulent transfers (Adv. No. 2:10–ap–01221). This action

---

**7.** We take judicial notice of the pleadings mentioned below pursuant to *O'Rourke v. Seaboard Sur. Co. (In re E.R. Fegert, Inc.)*, 887 F.2d 955, 957–58 (9th Cir.1989) (appellate court may take judicial notice of bankruptcy court records).

was based in part on the allegation that RF had loaned the $5,000,000 to Structural so that Structural could purchase the Oregon Property. The outcome of the adversary proceeding is pending, but in the event Debtors prevail, RF will hold no lien position on any of these estates and its claims against these estates will be denied.

In their first amended plan, Debtors classified PCB's claim in class 3. PCB's claim is impaired under the plan. The plan states that PCB holds the first priority lien against the sale proceeds for Lot # 173 and the other lots. Debtors classified RF's claim in class 5 and its claim is impaired. The plan provides that in the event RF's claim is allowed, it will be paid from a capital contribution made by Coast Projects, LLC. The confirmation of Debtors' plan has been continued from time to time.

## II. JURISDICTION

The bankruptcy court had subject matter jurisdiction over the PCB Adversary under 28 U.S.C. § 1334(b) and the statutory authority to enter a final judgment in the lien priority dispute under 28 U.S.C. § 157(b)(2)(K). However, relying on *Stern,* RF challenges the constitutional authority of the bankruptcy court to enter the final judgment under appeal. We address this argument below. We have jurisdiction over this appeal under 28 U.S.C. § 158.

## III. ISSUES [8]

■ A. Under Article III of the United States Constitution as interpreted by the Supreme Court in *Stern,* was the bankruptcy court constitutionally empowered to enter a final judgment in this adversary proceeding?

Did RF waive or forfeit its objection to the bankruptcy court's statutory and constitutional authority to enter final judgment?

Did the bankruptcy court err by entering a judgment in excess of the prayer for relief in the FAC and in excess of the issues submitted by the parties' joint pretrial order?

## IV. STANDARDS OF REVIEW

■ We review the constitutionality of a federal statute de novo. *Deitz v. Ford (In re Deitz),* 469 B.R. 11, 16 (9th Cir. BAP 2012).

■ "Whether a waiver of constitutional rights was made knowingly and voluntarily is a mixed question of law and fact which we review de novo." *Moran v. Godinez,* 57 F.3d 690, 698 (9th Cir.1995), *amending* 40 F.3d 1567 (9th Cir.1994).

Findings of fact are reviewed under the clearly erroneous standard, and conclusions of law, de novo. *Christensen v. Tucson Estates, Inc. (In re Tucson Estates, Inc.),* 912 F.2d 1162, 1166 (9th Cir.1990).

## V. DISCUSSION

RF argues that the facts of this case fall squarely within the holding of *Stern* because PCB's lien priority claim was a common law claim under Washington state law, did not stem from the bankruptcy itself or the provisions of Title 11 and would not be resolved in the claims allowance process. In addition, RF asserts that it could not waive the bankruptcy court's authority to enter a final judgment

---

**8.** RF presented one statement of the issues on appeal with its notice of appeal and designation of the items in the record on appeal and a different statement of the issues as part of its brief. Any issues not discussed in RF's opening brief are waived. *See Arpin v. Santa Clara Valley Transp. Agency,* 261 F.3d 912, 919 (9th Cir.2001) (issues not specifically and distinctly argued in opening brief are waived).

when that authority was unconstitutional. Finally, RF asserts that because the bankruptcy court had no constitutional authority to enter a final judgment, it may challenge that authority for the first time on appeal. Because RF primarily relies on *Stern* to have us either dismiss this adversary or set aside the final judgment, we begin our discussion with a brief recitation of the facts and holdings in *Stern*.

Vickie Lynn Marshall (Vickie), also known as Anna Nicole Smith, was the surviving widow of J. Howard Marshall II (J. Howard). After J. Howard died, Vickie became engaged in several disputes over J. Howard's estate with his younger son, E. Pierce Marshall (Pierce), who was the ultimate beneficiary. Relevant here is the dispute between Vickie and Pierce after Vickie filed her bankruptcy petition.

Pierce filed an adversary complaint in the bankruptcy proceeding, alleging a claim for defamation and seeking to have the yet to be liquidated debt declared nondischargeable. Vickie filed a counterclaim against Pierce for tortious interference with the "gift" she expected from her husband. The bankruptcy court found in favor of Vickie on the defamation claim and her counterclaim, ultimately awarding her over $400 million in compensatory damages and $25 million in punitive damages on the counterclaim. *Stern*, 131 S.Ct. at 2601. We do not repeat the procedural details and dispositions of the case after Pierce appealed which can be found at 131 S.Ct. at 2601–02.

The Supreme Court's decision involved the constitutional authority of the bankruptcy court to enter a final judgment on Vickie's state law counterclaim in the adversary proceeding. Despite the fact that the bankruptcy court was statutorily authorized to enter a final judgment on the counterclaim which was designated as a core matter under 28 U.S.C. § 157(b)(2)(C), the Supreme Court held that the bankruptcy court was not constitutionally authorized to do so for at least three reasons: (1) the claim arose solely under state law and was unrelated to and did not need to be resolved in order to determine the creditor's claim against the bankruptcy estate, 131 S.Ct. at 2612–18; (2) the claim at issue did not fall within the public rights exception, *Id.* at 2614–18; and (3) the parties did not unanimously consent to a final adjudication by a non-Article III tribunal. *Id.* at 2614.

The Court relied in part on its earlier decision in *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 109 S.Ct. 2782, 106 L.Ed.2d 26 (1989), which held that a noncreditor has a right to a jury trial when sued by a bankruptcy trustee for fraudulent conveyance. In *Granfinanciera*, the Court found that fraudulent conveyance actions "are quintessentially suits at common law that more nearly resemble state-law contract claims brought by a bankrupt corporation to augment the bankruptcy estate than they do creditors' hierarchically ordered claims to a pro rata share of the bankruptcy res." 492 U.S. at 56, 109 S.Ct. 2782. In *Stern*, the Court stated that *"Granfinanciera's* distinction between actions that seek 'to augment the bankruptcy estate' and those that seek 'a pro rata share of the bankruptcy res,' [492 U.S. at 56, 109 S.Ct. 2782], reaffirms that Congress may not bypass Article III simply because a proceeding may have *some* bearing on a bankruptcy case; the question is whether the action at issue stems from the bankruptcy itself or would necessarily be resolved in the claims allowance process." 131 S.Ct. at 2618.

The Supreme Court cautioned that its holding was a narrow one. *Id.* at 2620 ("[W]e agree with the United States that the question presented here is a 'narrow' one."). "We conclude today that Con-

gress, in one isolated respect, exceeded" the Constitutional limitation on the exercise of judicial power to Article III judges by empowering the bankruptcy court "to enter a final judgment on a state law counterclaim that is not resolved in the process of ruling on a creditor's proof of claim." *Id.*

Another aspect of the Court's decision addressed the issue of Pierce's consent to have the bankruptcy court adjudicate his defamation claim. Pierce argued that the bankruptcy court lacked jurisdiction to enter a final order on his defamation claim because that claim was a "personal injury tort" under 28 U.S.C. § 157(b)(5) which was required to be tried in the district court. 131 S.Ct. at 2606. The Supreme Court expressly rejected this argument, holding that 28 U.S.C. § 157 "does not have the hallmarks of a jurisdictional decree" and that statutes should not be interpreted "as creating a jurisdictional bar when they are not framed as such." *Id.* at 2607. The Supreme Court further noted that "[§ ]157 allocates the authority to enter final judgment between the bankruptcy court and the district court . . . [and t]hat allocation does not implicate questions of subject matter jurisdiction." *Id.* (citing 28 U.S.C. § 157(c)(2) (parties may consent to entry of final judgment by Bankruptcy Judge in non-core case)).

Having established that the bankruptcy court had subject matter jurisdiction over the defamation claim, the Supreme Court agreed with Vickie that Pierce consented to the bankruptcy court's resolution of his defamation claim based on his conduct during the litigation. *Id.* First, the Court observed that Pierce had filed a proof of claim based on his cause of action for defamation. Vickie's objection to his proof of claim "prompted Pierce to advise the Bankruptcy Court that '[a]ll parties are in agreement that the amount of the contingent Proof of Claim filed by [Pierce] shall be determined by the adversary proceedings.' " *Id.* Second, the Court noted that Pierce waited until over two years into the litigation—and after several adverse discovery rulings—to raise the issue by filing a motion with the district court to withdraw the reference. Third, after the district court withdrew the reference and later returned the proceeding to the bankruptcy court, Pierce advised the court that he was "happy to litigate [his] claim there." *Id.* Given Pierce's course of conduct, the Supreme Court concluded that he "consented to that court's resolution of his defamation claim (and forfeited any argument to the contrary)." *Id.* at 2608. The Court noted:

> We have recognized 'the value of waiver and forfeiture rules' in 'complex' cases, *Exxon Shipping Co. v. Baker*, 554 U.S. 471, 487–488, n. 6, 128 S.Ct. 2605, 171 L.Ed.2d 570 (2008), and this case is no exception. In such cases, as here, the consequences of 'a litigant . . . 'sandbagging' the court—remaining silent about his objection and belatedly raising the error only if the case does not conclude in his favor,' *Puckett v. United States*, 556 U.S. 129, [134], 129 S.Ct. 1423, 1428–29, 173 L.Ed.2d 266 (2009) (some internal quotation marks omitted)—can be particularly severe. If Pierce believed that the Bankruptcy Court lacked the authority to decide his claim for defamation, then he should have said so—and said so promptly. *See United States v. Olano*, 507 U.S. 725, 731, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993) (" 'No procedural principle is more familiar to this Court than that a constitutional right,' or a right of any other sort, 'may be forfeited . . . by the failure to make timely assertion of the right before a tribunal having jurisdiction to determine it' " (quoting *Yakus v. United States*, 321 U.S. 414, 444, 64 S.Ct. 660, 88 L.Ed. 834 (1944))).

Instead, Pierce repeatedly stated to the Bankruptcy Court that he was happy to litigate there. We will not consider his claim to the contrary, now that he is sad. *Id.* Moreover, although the Supreme Court did not find Pierce had "truly consent[ed]" to the bankruptcy court's resolution of Vickie's counterclaim, there is no indication in its decision that the Supreme Court meant that consent was never possible. 131 S.Ct. at 2614.

## A. The Narrow Holding of *Stern* does not Apply to this Dispute

We recently addressed the applicability of *Stern* to nondischargeability proceedings under § 523 in *In re Deitz*, 469 B.R. 11. There, acknowledging the directive from the majority decision in *Stern* that the decision was a narrow one, we followed the majority of courts which have declined to extend the holding in *Stern* to all statutorily designated core proceedings simply because the underlying controversy was governed by state law. *Id.* at 18–19. In rejecting an overly broad reading of *Stern*, we observed that the "few cases ... suggesting an expansive interpretation of *Stern* ... generally limit[ed] their concerns to those actions in bankruptcy courts that seek to augment the bankruptcy estate at the expense of third parties, primarily fraudulent conveyance avoidance actions, because those legal actions seek through a money judgment to take the defendant's property and that adjudication can only be made by a member of the independent Article III judiciary." [9] *Id.* at 18. We do not depart from our narrow interpretation of *Stern* in this case.

RF seems to argue that *Stern* stands for the proposition that matters involving state law would divest the bankruptcy court from exercising any authority whatsoever with respect to any claim or matter asserted in a bankruptcy case. This expansive interpretation is contrary to the edict of *Stern* and our adoption of a narrow interpretation of its holding in *Deitz*. Moreover, the facts of this case do not involve a state law based counterclaim by the estate against a creditor who has filed a proof of claim, so *Stern* has no direct application to our facts. Although the claims of PCB and RF were disputing interests "defined by state law," 131 S.Ct. at 2616, that is where the similarity between *Stern* and this case ends.

Unlike the resolution of Vickie's counterclaim in *Stern*, which was not necessary to adjudicating the claim of the creditor, resolution of the lien priority dispute here was part and parcel of the claims resolution process and thus "integral to the restructuring of the debtor-creditor relationship." *Id.* at 2617. No doubt, resolution of the dispute against property of the estate allowed Debtors to determine PCB's and RF's share of the sale proceeds and, if applicable, their pro rata share of "the bankruptcy res" vis-a-vis other claimants under the plan.

Indeed, the respective priorities of the parties was ultimately reflected in the classification and characterization of PCB's and RF's claims in Debtors' first amended plan. Debtors designated PCB's claim as impaired and placed PCB in class 3. The first amended plan reflected that PCB would be paid from the sale proceeds of Lot #173 and the other lots due to the bankruptcy court's determination that it held a first priority lien on the proceeds. Further, because it was determined that PCB held a secured claim on the proceeds, PCB's claim was subject to surcharge un-

---

9. In the end, the *Deitz* Panel concluded that there was "little doubt that a bankruptcy court, as an Article I tribunal, has the constitutional authority to hear and finally determine what claims are non-dischargeable in a bankruptcy case." 469 B.R. at 20.

der § 506. In contrast, Debtors placed RF in class 5, below the unsecured claims in class 4. Debtors designated RF's claim as impaired and, if RF's claim was an allowed claim, it would be paid a percentage of its claim from a capital contribution made by a third party. Debtors' classification and treatment of PCB and RF under its first amended plan demonstrate that the PCB Adversary was fundamentally different from a traditional common law lien priority dispute between private parties. Accordingly, the lien priority dispute against the sale proceeds cannot be characterized as a private matter simply involving the "liability of one individual to another" under Washington law. 131 S.Ct. at 2612.

RF concedes that lien priority claims among creditors might appear to be squarely encompassed within the claims allowance process. However, RF argues that PCB is not a direct creditor of either debtor, Debtors' estates have no interest in Lot # 173 because the secured liens exceed the value of the property, and neither PCB nor RF have filed proofs of claim.[10] We interpret these arguments to assert that the lien priority dispute, which is based on state law, is between two third parties and does not affect Debtors or property of their estates.

The record does not support these arguments. Debtors' schedules listed PCB as a secured creditor and nowhere in the record has PCB's creditor status ever been challenged.[11] There is also no dispute that Sonas is a creditor of the estate and a co-plaintiff in the PCB Adversary. Further, RF's assertion that Debtors have no interest in Lot # 173 because it is overencumbered is also incorrect as a matter of law. *See Dewsnup v. Timm*, 502 U.S. 410, 431 n. 4, 112 S.Ct. 773, 116 L.Ed.2d 903 (1992) (Scalia, J., dissenting) ("The estate 'has an interest,' of course, even in its overencumbered property.") (citing § 541(d) (providing that property for which the debtor holds legal title alone is "property of the estate" to the extent of that legal title) and § 541(a)(1) (defining the bankruptcy estate to include "all legal or equitable interests of the debtor in property as of the commencement of the [bankruptcy] case")).

In sum, the determination of priority between two creditors such as PCB and RF is not only tied to the claims resolution process, but it also involves the adjudication of rights created by the Bankruptcy Code under § 506. *See Frazer v. Prop. Owners' Ass'n of Canyon Village at Cypress Springs (In re Frazer)*, 466 B.R. 107, 114 (Bankr.S.D.Tex.2012) (noting that resolution of a lien priority dispute was distinguishable from *Stern* because an express bankruptcy statute—i.e. § 506(a)—would determine whether the creditor had a secured claim or an unsecured claim). Ac-

---

**10.** Secured creditors are not required to file proofs of claim to preserve their rights to recovery from the estate. § 506. Moreover, at the time of the adversary, no proof of claim deadline had been set. Since then, PCB filed its proof of claim (Claim No. 4) on February 23, 2012, asserting a secured claim in the amount of $3,553,737.12 against Debtors' estates. RF also filed a proof of claim. RF argued at the hearing on this matter that because the proofs of claim came after the judgment in the adversary, the resolution of the priority of their claims could not have been part of the claims allowance process.

We are not convinced. Whether the parties' proofs of claim were filed before the adversary proceeding or after is immaterial. In the end, the resolution of the lien priority dispute was a necessary part of the claims process as reflected in Debtors' first amended plan.

**11.** From what we can tell, PCB's creditor status was addressed in connection with Debtors' motion to distribute the sale proceeds to PCB. Therefore, we are reluctant to address this issue in any greater depth for purposes of this appeal.

cordingly, the bankruptcy court's exercise of power over the lien priority dispute was a constitutional delegation of power from Congress. *Stern* did not limit that power.

## B. Waiver and Forfeiture

██ Even if the *Stern* analysis applied to these facts, which it does not, we may still find that RF waived or forfeited [12] its right to challenge the bankruptcy court's statutory and constitutional authority to enter a final judgment for the first time on appeal.

██ The issue in *Stern* only invoked the bankruptcy court's authorization to enter a final judgment and not the subject matter jurisdiction of the court.[13] Therefore, in light of the Supreme Court's discussion in *Stern* regarding waiver and forfeiture, and for the reasons more fully explained below, we agree with those bankruptcy courts which have concluded that *Stern* does not affect the parties' ability to consent to the authority (constitutional or otherwise) of the bankruptcy court to enter a final judgment in this adversary proceeding. *See Ardi Ltd. P'ship v. The Buncher Co. (In re River Entm't Co.)*, 467 B.R. 808, 819 (Bankr.W.D.Pa.2012); *Spanish Palms Mktg. LLC v. Kingston (In re Kingston)*, 2012 WL 632398, at *3 (Bankr.D.Idaho Feb. 27 2012) ("Even if the Court did not have constitutional power to enter a final judgment as to any of the claims raised by the parties in this adversary proceeding, the parties, in their submissions, have expressly consented to the Court's entry of such judgments."); *Mercury Cos. v. FNF Sec. Acquisition, Inc.*, 460 B.R. 778, 782 (D.Colo.2011) (same); *Adams Nat'l Bank v. GB Herndon & Assocs., Inc. (In re GB Herndon & Assocs., Inc.)*, 459 B.R. 148, 162 (Bankr. D.D.C.2011) (Bankruptcy courts "may adjudicate a proceeding, without running afoul of Article III, when there has been consent by the parties."); *In re Olde Prairie Block Owner, LLC*, 457 B.R. 692, 699–702 (Bankr.N.D.Ill.2011) ("If *Stern* had destroyed the power of Bankruptcy Judges to enter final judgments by consent ..., that would have called into question the power of Magistrate Judges and other Article I judicial officers to make final adjudication by consent...."); *compare Waldman v. Stone*, 698 F.3d 910, 918 (6th Cir. 2012) (objection that bankruptcy court acted beyond its statutory authority under 28 U.S.C. § 157 can be forfeited, but structural principle advanced by Article III cannot be waived); *see also Pacemaker Diagnostic Clinic of Am., Inc. v. Instromedix, Inc.*, 725 F.2d 537, 542 (9th Cir.1984) (en banc) (in analyzing the constitutionality of the Magistrates Act, the Ninth Circuit gave "considerable weight to the judgment of

---

12. We use "waiver" as being synonymous with "consent". Waiver ordinarily means "an intentional relinquishment or abandonment of a known right or privilege." *Johnson v. Zerbst*, 304 U.S. 458, 464, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938). Of course, consent can be implied from "the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused." *Id.* However, those facts and circumstances must still indicate that an intelligent decision to waive the right had been made. *Id.* Whereas waiver implies intent, forfeiture is simply "the failure to make the timely assertion of a right." *Olano*, 507 U.S. at 733, 113 S.Ct. 1770.

13. RF asserts that it can raise the question regarding the bankruptcy court's "subject matter jurisdiction" for the first time on appeal and, therefore, it has not waived or consented to the bankruptcy court's "jurisdiction." Indeed, the general rule is that subject matter jurisdiction can be raised at any time and cannot be waived by a party. *See Attorneys Trust v. Videotape Computer Prods., Inc.*, 93 F.3d 593, 595 (9th Cir.1996). However, the bankruptcy court's subject matter jurisdiction is not implicated in this appeal.

Congress that consent of the parties eliminates constitutional objections").

The Supreme Court explicitly stated in *Stern* that constitutional rights may be forfeited by a party's failure to make timely assertion of the right before a tribunal having jurisdiction to determine it. *Stern*, 131 S.Ct. at 2608 (citing *Olano*, 507 U.S. at 731, 113 S.Ct. 1770). Moreover, our conclusion that a party may waive its constitutional objection to the authority of the bankruptcy court to enter a final judgment is entirely consistent with the recent Ninth Circuit decision in Exec. *Benefits Ins. Agency v. Arkison (In re Bellingham Ins. Agency, Inc.)*, 702 F.3d 553 (9th Cir.2012). There, citing the same authorities that we cite, the Ninth Circuit found that a "bankruptcy litigant impliedly consents to the bankruptcy court's jurisdiction when he fails to timely object." *Id.*, at 567. The Ninth Circuit then addressed whether Rules 7008 and 7012, which implement the statutory core/non-core dichotomy, preclude a finding of implied consent and determined that a litigant's actions may be sufficient to establish consent notwithstanding the rules. *Id.*, at 568–69. In addition, the *Bellingham* court determined, as we do below, that it was no hindrance to waiver that the *Stern* ruling did not come down until after the pertinent litigation was pending. *Id.*, at 569. In sum, the Ninth Circuit concluded that a party may impliedly consent by conduct and thereby waive any constitutional objection to the bankruptcy court's authority to enter a final judgment. We now turn to whether the rules regarding waiver and forfeiture espoused in *Stern* and confirmed by *Bellingham* apply to RF under the circumstances of this case.

A bankruptcy court may "enter appropriate orders and judgments, subject to review under" 28 U.S.C. § 158 in core matters. 28 U.S.C. § 157(b)(1). This statutory authorization includes authority to enter final judgments on those matters. *Stern*, 131 S.Ct. at 2604–05. A lien priority dispute is a core matter under 28 U.S.C. § 157(b)(2)(K). In contrast, the bankruptcy court's power over non-core proceedings, or those "related to" a bankruptcy case, is limited to issuing proposed findings of fact and conclusions of law that are subject to de novo review by the district court, unless the parties consent. 28 U.S.C. § 157(c)(1) and (2). The core/noncore distinction has significance because at the time of judgment in this matter it would have been necessary for the bankruptcy court to characterize the judgment as final or otherwise treat it as a recommendation which would require referring the matter back to the district court to enter final judgment unless the parties consented. *See* 28 U.S.C. § 157(c).

■■■■ RF has never challenged the bankruptcy court's statutory authority to enter final judgment on PCB's claims. Here, the parties admitted in their pleadings that the bankruptcy court had jurisdiction over the action and that the lien priority dispute was a "core" proceeding. Pursuant to Rule 7008, PCB alleged in its FAC that the lien priority dispute was a core matter under 28 U.S.C. § 157(b)(2)(K). Pursuant to Rule 7012(b), RF admitted this allegation in its answer.[14] "[A]n allegation that the proceeding is core serves as an express consent for the bankruptcy court to treat that proceeding as core and enter a final order in that proceeding." *In re Mercury Cos.*, 460 B.R. at 781. At no time did RF allege the matter

---

**14.** The designation of the lien priority dispute as core was also contained in the parties' joint pretrial statement.

was non-core. Such an allegation would have implicated the consent procedure for non-core matters set forth in Rule 7012(b). Failure to implicate and follow such consent procedures for non-core matters also constitutes consent to the authority of the bankruptcy court to enter orders and judgments. *Id.* at 782.

In its conclusions of law and order issued after the trial, the bankruptcy court explicitly found that the matter was "core" and that no party had "questioned the court's jurisdiction." [15] Thus, RF was put on notice that the bankruptcy court was treating the matter as core and would enter a final judgment.

RF filed a motion for reconsideration of the FFCL and order, but at no time did it raise any issue that the matter was not core or that the court lacked authority to enter a final judgment in the matter. RF also objected to the form of the final judgment, but never objected prior to the entry of the judgment on the grounds that Article III of the Constitution barred the bankruptcy court from entering a final judgment. "Its failure to [object] indicates a willingness to have the bankruptcy court adjudicate its state law claims." *Daniels–Head & Assocs. v. William M. Mercer, Inc. (In re Daniels–Head & Assocs.),* 819 F.2d 914, 919 (9th Cir.1987) (failure to raise a timely objection to core treatment constitutes implied consent); *see also McFarland v. Leyh (In re Tex. Gen. Petroleum Corp.),* 52 F.3d 1330, 1337 (5th Cir.1995) ("A party who fails to object to a bankruptcy court's assumption of core jurisdiction consents to that court's entry of

final judgment."); *see also Roell v. Withrow,* 538 U.S. 580, 123 S.Ct. 1696, 155 L.Ed.2d 775 (2003) (finding that consent to proceedings before a federal magistrate judge can be implied from a party's litigation conduct).[16]

RF argues that its waiver of an Article III adjudication was not "knowing and voluntary" because, pre-*Stern,* it would not have had a legal basis to contest the proceeding before the bankruptcy court. We are not persuaded. The Supreme Court's decision in *Stern* affirmed the Ninth Circuit's decision in *Stern v. Marshall (In re Marshall),* 600 F.3d 1037. Thus, the Supreme Court's decision did not result in a wholesale change of the law. *See In re Bellingham Ins. Agency, Inc.,* 702 F.3d at 569 (concluding that its opinion in *Stern* was sufficient to alert appellant to the possible jurisdictional problem). Finally, the Supreme Court's decision was issued on June 23, 2011, nearly three months before the bankruptcy court entered the final judgment and more than three months before RF filed its September 26, 2011, notice of appeal.

In sum, similar to Pierce in *Stern,* RF litigated in the adversary proceeding for over two years and only raised the issue regarding the bankruptcy court's authority to enter the final judgment after an adverse ruling and for the first time on appeal. "[T]he consequences of a 'litigant ... "sandbagging" the court—remaining silent about his objection and belatedly raising the error only if the case does not conclude in his favor,'—can be particularly

---

15. We suspect that the bankruptcy court's reference to its "jurisdiction" was to its "core jurisdiction" under 28 U.S.C. § 157(b)(2)(K), which gave it the power to enter a final judgment in the matter.

16. We also may infer RF's consent to the bankruptcy court's authority to enter final judgment in this matter by RF's election to

bring this appeal to the BAP rather than to the district court where it was entitled to de novo review. RF never argued in its appellate briefs that the matter was noncore. To the contrary, RF admitted that it never objected to the bankruptcy court's treatment of the dispute as a core matter.

severe." *Stern*, 131 S.Ct. at 2608. To use the words of the Supreme Court: "If [RF] believed that the Bankruptcy Court lacked the authority to decide [the lien priority dispute], then [it] should have said so—and said so promptly." *Id.* Accordingly, not only did RF's course of conduct show that it implicitly consented to the bankruptcy court's authority to enter a final judgment, but the facts and circumstances of the case also indicate RF's consent was knowing and voluntary.

■ However, even without RF's consent, its failure to object to the bankruptcy court's statutory authority in a timely manner results in a forfeiture of any argument to the contrary. RF maintains that it could not waive its constitutional challenge to the bankruptcy court's entry of the final judgment per the Supreme Court's decision in *Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 106 S.Ct. 3245, 92 L.Ed.2d 675 (1986). However, *Schor* does not hold there can never be a waiver of a constitutional right.

In *Schor*, the Supreme Court observed that "Article III addresses both a structural, or separation of powers, interest, and also protects a personal interest, a litigant's 'right to have claims decided before judges who are free from potential domination by other branches of government.'" *Id.* at 848, 106 S.Ct. 3245. There, the Supreme Court held that litigants may waive their personal right to have an Article III judge preside over a civil trial. *Id.* As noted above, the record provides ample support for RF's waiver of its "personal right" to have an Article III judge preside over the lien priority dispute.

The *Schor* Court explained that with respect to Article III's structural limitations, notions of consent and waiver cannot be dispositive. *Id.* at 851, 106 S.Ct. 3245. However, before applying this rule, the structural separation of powers must be offended by adjudication of a dispute by a non-Article III tribunal. *Id.* at 850–51, 106 S.Ct. 3245. For the structural powers to be offended, they must be implicated in the first place.

■ Final adjudications by non-Article III tribunals are upheld when the structural protections of Article III are not implicated. *In re River Entm't Co.*, 467 B.R. at 819 (citing *Peretz v. United States*, 501 U.S. 923, 937–39, 111 S.Ct. 2661, 115 L.Ed.2d 808 (1991); *Schor*, 478 U.S. at 851–52, 106 S.Ct. 3245). "Whether the structural protections of Article [III] are 'implicated', depends primarily on the degree of control exercised by Article III judges over ... the non-Article III tribunal in question." *In re River Entm't Co.*, 467 B.R. at 819 (citing *Peretz*, 501 U.S. at 937–39, 111 S.Ct. 2661; *United States v. Raddatz*, 447 U.S. 667, 685–86, 100 S.Ct. 2406, 65 L.Ed.2d 424 (1980) (Blackmun, J., concurring)).

The degree of control test was illustrated in *Peretz* where the Supreme Court held that there was no constitutional defect when, following the consent of the parties, a district court judge delegated the duty of conducting voir dire in a felony proceeding to a magistrate judge. *Peretz*, 501 U.S. 923, 111 S.Ct. 2661, 115 L.Ed.2d 808. The court found no structural protections of Article III were implicated when, under the Magistrate's Act, Article III judges maintained a substantial amount of control over both the magistrate judges and the matters delegated to them. *Id.* at 937–38, 111 S.Ct. 2661. The Court noted that district court judges were responsible for appointing magistrate judges, removing them from office, and maintaining plenary authority over what matters were delegated to the magistrate judges once they were appointed. *Id.* at 937–39, 111 S.Ct. 2661. The Supreme Court held that because the entire process of magistrate ad-

judication "takes place under the district court's total control and jurisdiction," there was no danger that the structural protections of Article III would be violated. *Id.* at 937, 111 S.Ct. 2661.

Prior to *Peretz*, the Ninth Circuit used similar reasoning to uphold the constitutionality of the Magistrates Act in *Pacemaker Diagnostic Clinic of Am., Inc.*, 725 F.2d at 540. *See also Technical Automation Servs. Corp. v. Liberty Surplus Ins. Corp.*, 673 F.3d 399 (5th Cir.2012) (holding that the Supreme Court's holding in *Stern* did not extend to magistrate judges when Fifth Circuit precedent, which was not overruled, concluded that the Magistrate Act was constitutional).

■ When the structural protections under Article III are not offended, we apply the general rule that a party such as RF who fails to timely raise an issue in the bankruptcy court cannot raise it on appeal. *Stewart v. U.S. Bancorp*, 297 F.3d 953, 956 n. 1 (9th Cir.2002) ("In general, a party who fails to raise an issue in the [bankruptcy] court, cannot raise it on appeal."). Further, the Ninth Circuit has applied ordinary forfeiture rules even when structural protections may be implicated. *See United States v. Doremus*, 888 F.2d 630, 633 n. 3 (9th Cir.1989) (refusing to consider a separation of powers issue that was raised for the first time on appeal); *see also Olano*, 507 U.S. at 731, 113 S.Ct. 1770 (" 'No procedural principle is more familiar to this Court than that a constitutional right,' or a right of any other sort, 'may be forfeited in criminal as well as civil cases by the failure to make timely assertion of the right before a tribunal having jurisdiction to determine it.' "); *compare Wald-*

*man,* 698 F.3d at 918 (stating without analysis that structural principles advanced by Article III cannot be waived). Application of this straightforward rule encourages litigants to raise a legal objection to the bankruptcy court's authority to enter final judgment on core matters as soon as possible rather than waiting until final judgment is entered.

For all these reasons, we conclude that RF consented to the bankruptcy court's authority, constitutional and otherwise, to enter a final judgment in this matter and has forfeited any argument to the contrary at this late date.

**C. The Judgment is not in Excess of the Prayer for Relief in the FAC**

■ RF alternatively argues that the judgment exceeded the scope of relief requested by PCB.[17] We disagree. The judgment states that "Plaintiffs have established that Pacific Continental Bank has a first-lien priority in the sale proceeds being held by this Court pursuant to the Stipulated order re Transfer, Deposit and Maintenance of Sale Proceeds in Court Registry in Case No. 2:08–bk–18608–GBN." This relief is consistent with the FAC which sought to establish lien priority between RF and PCB and the prayer for relief. The joint pretrial statement also stated that the adversary proceeding was to adjudicate the priority between PCB and RF as to proceeds of property owned and sold by Washington Coast and that the sales proceeds were being held pending a determination of lien priority in this adversary. Finally, the bankruptcy court amended the judgment so there was

---

**17.** Even if the relief granted exceeded the relief requested, Civil Rule 54(c) authorizes the court to grant the relief to which each party is entitled. That rule, incorporated by Rule 7054, states that "Every other final judg- ment [other than a default judgment] should grant the relief to which each party is entitled, even if the party has not demanded that relief in its pleadings."

no doubt that it did not establish PCB's present right to the sale proceeds.

RF contends that the judgment violates the scope of the relief because PCB does not have standing to assert a claim to the proceeds until it forecloses on the Sonas Deeds of Trust and PCB is required to marshal its collateral before it can lay claim to the sale proceeds. However, these issues regarding PCB's ability to receive a distribution from the sale proceeds were not part of the judgment. In addition, the language in the judgment does not foreclose a marshaling argument to the extent one exists. Thus, none of the issues RF raises on appeal are implicated by the judgment.

█ These issues appeared to be squarely before the bankruptcy court in connection with Debtors' motion to distribute the sale proceeds to PCB. That order was not appealed. Accordingly, we find these issues improperly before us in this appeal.

## VI.  CONCLUSION

In sum, we conclude that the holding in *Stern* does not apply to the lien priority dispute between PCB and RF. We further conclude that RF waived by consent and forfeiture its objection to the bankruptcy court's statutory and constitutional authority to enter the final judgment in the PCB Adversary. Finally, the judgment did not exceed the relief sought in the FAC. Accordingly, we AFFIRM the bankruptcy court's decision.